[No. S056373. Mar. 26, 1998.]

CHARLES SCOTT HUGHES, Plaintiff and Appellant, v.
BOARD OF ARCHITECTURAL EXAMINERS, Defendant and Appellant.

**COUNSEL**

Smiland & Khachigian, Willliam M. Smiland and Kenneth L. Khachigian for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Joel S. Primes and Steven M. Kahn, Deputy Attorneys General, for Defendant and Appellant.

**OPINION**

**GEORGE, C. J.**—Pursuant to Business and Professions Code sections 5583 and 5584, an architect may be disciplined for wrongful conduct occurring

after his or her license has been issued.[1] In this case we decide whether, pursuant to those sections, an architect may be disciplined for wrongful conduct that occurred prior to the time the architect's license was issued, when the license itself was not obtained by fraud or misrepresentation. We conclude that the cited statutes also may be applied to wrongful conduct that precedes issuance of the license.

## I

Charles Scott Hughes studied architecture at the University of Virginia and the Boston Architectural Center between 1970 and 1975 but did not receive a degree. Hughes successfully completed the architectural examination given by the Board of Architectural Examiners of Washington, D.C., but, having failed to submit his college transcript, he did not obtain an architectural license from that entity.

Following an apprenticeship in several architectural firms, in 1982 Hughes established his own architectural firm. Initially, Hughes employed licensed architects to perform that part of the work that required licensure as an architect. Eventually, however, he personally performed work that required a license.

In addition, Hughes took measures to conceal his lack of a license, and to hold himself out as a licensed architect. In 1981, the American Institute of Architects (hereafter, the AIA), sent Hughes a letter requesting that he cease representing himself to be a member of that organization. In 1986, Hughes applied for membership in the AIA, falsely stating on his application that he was licensed in Washington, D.C., and enclosing the certificate of registration of another architect upon which he had substituted his own name. Also in 1986, Hughes falsely stated on his resume that he was a registered architect in Washington, D.C., Virginia, and Maryland. During the period in which he operated his own firm, Hughes applied architecture stamps belonging to other licensed architects to work he himself had performed.

In January 1989, while Hughes was engaged in the design of an addition to the residence of Dan Quayle, then Vice-President of the United States, it was discovered that Hughes did not have a valid license. The Board of Architectural Examiners of Washington, D.C., initiated disciplinary proceedings. In addition, following his indictment by a grand jury, the Commonwealth of Virginia charged Hughes with one count of misrepresentation to a government agency in connection with representations he made in the course

---

[1] Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

of performing architectural services for Arlington County. Hughes executed a plea agreement, pleading guilty to making a fraudulent misrepresentation to the county. In November 1989, the court ordered Hughes to perform 200 hours of community service, undergo counseling, and pay costs. Pursuant to Virginia law, the court suspended imposition of sentence until October 25, 1991, in order to permit Hughes an opportunity to meet the conditions of the court's order.

Hughes promptly completed the conditions imposed and on February 1, 1990, contacted his probation officer, requesting advancement of the court appearance set to resolve the disposition of the case, to enable Hughes to represent that he had not suffered any prior convictions. On February 12, 1990, the probation officer wrote to the court requesting the advancement. On April 27, 1990, the Arlington County prosecutor entered a nolle prosequi requesting that the charge be dismissed. The charge was not formally dismissed until May 1, 1990.

Meanwhile, on February 22, 1990, Hughes applied to the California Board of Architectural Examiners (hereafter, the Board) for a license to practice in California. Hughes enclosed the application with a transmittal letter explaining that he successfully had completed an architectural examination in Washington, D.C., in 1980 and the results of that examination were to be forwarded to the Board, but that he "did not complete" his licensing at that time and therefore was seeking initial registration in California. On the application form itself, Hughes provided information concerning his prior employment for other architectural firms as well as his self-employment at his own firm. Hughes left blank that part of the form designated "Licensed as:" and also indicated that he never had been licensed in any other state or foreign country. In the area of the form inquiring whether the applicant had been convicted of any offense and advising the applicant to report all convictions, including those dismissed pursuant to Penal Code section 1203.4 (dismissal of charges following fulfillment of probation terms), Hughes answered in the negative.

On March 8, 1990, Hughes wrote a supplemental letter to the Board, disclosing that he had "never completed the licensing process," and that "technically" his registration "was never perfected" in Washington, D.C., because of his "initial oversight" in failing to produce his college transcript. The letter indicated that during the period in the 1980's when he operated his own firm, the majority of the services that he or his firm performed did not require the services of a licensed architect. The letter also disclosed that in 1989, Hughes's architectural firm became involved in civil litigation that had "called into question" his professional licensing status, that his conduct

had been the subject of "a great deal of publicity," that he had "made a full disclosure" of the facts concerning his nonlicensure to the Washington, D.C., authorities (by whom "investigations were instituted"), that he had "closed his office," that the Commonwealth of Virginia had charged him with one count of misrepresentation to a government agency, that he had entered a plea to the charge, that imposition of his sentence had been suspended, that he had been placed on probation, paid restitution, and performed community service, that "on February 22, 1990, . . . all charges against [him] were dropped," and that, as a result, no charges were pending against him and he had no record.

The Board apparently did not respond to this communication. Hughes thereafter successfully completed the oral examination. On September 10, 1990, the Board issued Hughes a license.

In May 1991, the National Council of Architectural Registration Boards (hereafter, NCARB) sent a letter to the Board informing it that Hughes had sought NCARB certification based upon his California registration, the certification form for which indicated that the Board "has no derogatory information on file" concerning Hughes. NCARB indicated its understanding that Hughes previously had been denied registration in Virginia and Washington, D.C., "on the basis of character." NCARB suggested that the Board contact the boards of architectural examiners in those localities to obtain additional information. The Board then commenced an investigation.

On February 5, 1992, the Board filed an accusation against Hughes, asserting that he was subject to discipline and seeking suspension or revocation of his license. Based upon Hughes's statements in his application and subsequent explanatory letter, made prior to actual dismissal of the charge, that he never had been convicted of criminal charges and that the charge previously instituted against him had been dismissed, the accusation alleged that Hughes knowingly had made a false statement of fact in his application to the Board (§ 490) and had obtained his license by fraud or misrepresentation (§ 5579).

On June 29, 1992, the Board issued a supplemental accusation alleging three additional statutory violations. The Board asserted: (1) based upon his guilty plea entered in Arlington County in October 1989, Hughes had been convicted of a crime substantially related to the qualifications, functions, and duties of an architect (§ 5577); (2) based upon his seeking admittance to the AIA by substituting the certificate of registration of another architect and falsely stating on the application that he was registered as an architect in the District of Columbia since 1977, in falsely stating on his resume that he was

a graduate of the University of Virginia and a registered architect in Maryland, Virginia, and the District of Columbia, and in using the stamps or certificates issued to other architects on architectural plans that he personally had prepared in or about 1986, Hughes was guilty of fraud and deceit in the practice of architecture (§ 5583); (3) based upon his violation of Virginia law resulting in his guilty plea in October 1989, his misrepresentation or use of false documents in commercial dealings with Arlington County in January 1989, his submission of false information to the AIA, the false representations on his resume relating to his graduation from college and his professional licensure, and his improper use of the stamps or certificates of other architects in conjunction with his preparation of his own plans in or about 1986 as described above, Hughes was guilty of willful misconduct in the practice of architecture (§ 5584).

On August 13, 1992, a hearing was conducted before an administrative law judge. Considerable evidence was presented concerning Hughes's alleged misrepresentations to the Board as well as his earlier wrongful conduct. On November 19, 1992, a proposed decision issued. Therein, the administrative law judge found that Hughes had not violated section 490 or 5579 and that section 5577 did not apply, because he ultimately had not been convicted in the Commonwealth of Virginia and had not knowingly misstated (at the time he communicated with the Board) that the charges previously had been dismissed. The administrative law judge also found, however, that Hughes had violated sections 5583 and 5584 because he personally had undertaken work requiring licensure, falsely had stated on his application to the AIA that he had been registered to practice architecture in the District of Columbia since 1977 and had submitted therewith a falsified certificate of registration of another architect, falsely had stated on his resume that he was a graduate of the University of Virginia and a registered architect in Maryland, Virginia, and the District of Columbia, and had used or caused to be used the stamps of other architects on his own work during the period he operated his own firm. The administrative law judge ordered that Hughes's license be revoked.

Initially, the Board issued an order of nonadoption of the findings and proposed decision of the administrative law judge. After considering the record of the administrative hearing and further written argument, on June 16, 1993, the Board issued a decision adopting the proposed decision of the administrative law judge that Hughes's license be revoked for his performance of architectural work requiring a license without having obtained licensure, his false statement that he had a license and his substitution of another individual's certificate in order to gain admission to the AIA, his false statements on his resume that he had graduated from college and was a

registered architect in several jurisdictions, and his use on his own work of architectural stamps belonging to others. Hughes's license was revoked effective July 24, 1993.

On August 19, 1993, Hughes filed in superior court a petition for a peremptory writ of mandate pursuant to Code of Civil Procedure section 1094.5. That court denied the petition, determining that sections 5583 and 5584 authorized disciplinary action based upon prelicensure wrongful conduct, that the Board was not estopped to revoke the license, and that the Board's choice of sanction—revocation—was not excessive.

Hughes filed an appeal, and the Board filed a cross-appeal. The Court of Appeal reversed the judgment of the superior court solely on the basis that the relevant disciplinary statutes did not apply to prelicensure wrongful conduct.[2] On petition by the Board, we granted review, limiting the issue to be argued, pursuant to California Rules of Court, rule 29.2(b), to "whether an architect may be disciplined for misconduct occurring before a license is issued if the license was not obtained by fraud or misrepresentation."

II

Division 3 of the Business and Professions Code relates to various professions and vocations, each chapter of that division focusing upon a particular profession or vocation. Chapter 3 of the Architects Practice Act (§ 5500 et seq.) (hereafter, the Act) was enacted to regulate the practice of architecture in this state. The Act is divided into seven articles: article 1, general provisions (§§ 5500-5502); article 2, administration (§§ 5510-5528); article 3, application of the chapter (§§ 5535-5538); article 4, issuance of licenses (§§ 5550-5557); article 5, disciplinary proceedings (§§ 5560-5590); article 6, revenue (§§ 5600-5604); and article 7, architectural corporations (§§ 5610-5610.7).

---

[2]In his appeal, Hughes also contended that the Board did not have the power to reverse its earlier decision to license him, and that, in revoking his license, it had sanctioned him excessively. The Court of Appeal did not consider these claims, in light of its conclusion that sections 5583 and 5584 did not authorize disciplinary action based upon prelicensure wrongful conduct.

In its appeal, the Board contended that the trial court had erred in refusing to consider newly discovered evidence pertaining to Hughes's prelicensure wrongful conduct. The Court of Appeal concluded that the issue was moot in light of that court's holding that sections 5583 and 5584 could not be applied on the basis of prelicensure wrongful conduct.

The Board also contended that the trial court had jurisdiction to reconsider its determination that the criminal proceeding in the Commonwealth of Virginia did not constitute a criminal conviction within the meaning of section 5577. The Court of Appeal rejected this contention on the bases that the Board previously had conceded the Virginia criminal proceeding did not constitute a criminal conviction pursuant to section 5577, and that that section, as part of article 5 pertaining to the discipline of licensees, could not be applied to discipline a licensee for a conviction suffered prior to licensure.

The Act includes a legislative statement of purpose providing as follows: "The Legislature finds and declares that it is the mandate of the board to regulate the practice of architecture in the interest and for the protection of the public health, safety, and welfare. For this purpose, the board shall delineate the minimum professional qualifications and performance standards for admission to and practice of the profession of architecture. The board shall establish a fair and uniform enforcement policy to deter and prosecute violations of this chapter or any rules and regulations promulgated pursuant to this chapter to provide for the protection of the consumer." (§ 5510.1.)

Article 4 of the Act provides that a candidate for licensure must file an application with the Board. (§ 5550.) The applicant "shall" furnish evidence of the completion of eight years of training and educational experience in architectural work (§ 5552, subd. (b)) and "shall" not have committed acts or crimes constituting grounds for denial of licensure pursuant to section 480. (§ 5552, subd. (a)). Section 480, a part of division 1.5 pertaining to denial, suspension, and revocation of business and professional licenses generally, in subdivision (a) provides that a board may deny a license on the grounds that the applicant has (1) been convicted of a crime, (2) "[d]one any act involving dishonesty, fraud or deceit with the intent to substantially benefit himself or another, or substantially injure another," or (3) done any act that, if done by a licentiate of the business or profession would be a ground for suspension or revocation of a license. Subdivision (a) of section 480 further provides that such a crime or act may provide a basis for denial only if "substantially related to the qualifications, functions or duties of the business or profession for which application is made." Section 5553 provides that if the Board receives evidence that the applicant has committed or done any act that would be a ground for suspension or revocation if committed or done by a holder of a license, the Board may deny issuance of the license.

Article 4 of the Act also provides that any person who meets the qualifications set forth in that article and has filed an application and paid the application fee "shall be entitled to an examination for a license to practice architecture." (§ 5550.) In the event the applicant's examination is satisfactory, the applicant pays the license fee, and no charges of deception in obtaining the license or any other violation "of the provisions of this chapter" have been filed with the Board, that body "shall issue a license to the applicant showing that the person named therein is entitled to practice architecture . . . ." (§ 5551.)

Article 5 of the Act provides that the Board may on its own motion, and shall upon the verified written complaint of any person, investigate the

actions of any architect, and may temporarily suspend or permanently revoke the license of any architect "who is guilty of, or commits any one or more of, the acts or omissions constituting grounds for disciplinary action under this chapter." (§ 5560.) Article 5 specifies as a period of limitations that all accusations against licensees charging the holder of a license "with the commission of any act constituting a cause for disciplinary action shall be filed with the board within five years after the board discovers, or through the use of reasonable diligence should have discovered, the act or omission alleged as the ground for disciplinary action, whichever occurs first, but not more than 10 years after the act or omission alleged as the ground for disciplinary action." (§ 5561.) If the accusation alleges fraud or misrepresentation in obtaining the license, the accusation may be filed within three years after the Board's discovery of the alleged facts constituting fraud or misrepresentation. (§ 5561.)

Article 5 of the Act also sets forth particular acts or omissions constituting grounds for disciplinary action. The holder of a license may be subject to discipline if he or she is convicted of a crime (including one for which an order granting probation is made suspending the imposition of sentence) (§ 5577), is practicing in violation of the provisions of the chapter (§ 5578), has obtained the license by fraud or misrepresentation (§ 5579), is impersonating an architect of the same or similar name or is practicing under an assumed, a fictitious, or (if not providing services through a corporation) a corporate name (§ 5580), has aided or abetted the practice of architecture by a person not authorized to practice architecture (§ 5582), has affixed his or her signature to architectural work not personally performed or immediately supervised or has permitted the use of his or her name to assist a nonarchitect in evading the provisions of the chapter (§ 5582.1), has been guilty of incompetence or recklessness in the construction or structural design of a building (§ 5585), or has been disciplined by a public agency for an act related to architectural practice in another jurisdiction (§ 5586).

Included in the enumerated grounds for disciplinary action within article 5 are the two sections that are the subject of the present appeal. Section 5583 provides: "The fact that, in the practice of architecture, the holder of a license has been guilty of fraud or deceit constitutes a ground for disciplinary action." Section 5584 provides: "The fact that, in the practice of architecture, the holder of a license has been guilty of negligence or willful misconduct constitutes a ground for disciplinary action."

The Board contends that sections 5583 and 5584 authorize the discipline imposed, because the sections provide that the current holder of a license may be disciplined if he or she has been guilty in the past of fraud,

deceit, negligence, or willful misconduct. On the other hand, Hughes takes the position, with which the Court of Appeal agreed, that these statutes may not be applied to Hughes's conduct, because the three factual prerequisites set forth therein—(1) wrongful acts of the types specified, (2) done in the practice of architecture, (3) by the holder of a license—must occur contemporaneously with one another. Under this view, Hughes was not the "holder of a license" during the period in which he committed the above described acts of wrongful conduct.[3]

■ Our analysis commences with the premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. (*Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602, 606 [257 Cal.Rptr. 320, 770 P.2d 732].) " 'Our first step [in determining legislative intent] is to scrutinize the actual words of the statute, giving them a plain and common-sense meaning.' " (*California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175]; *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) " 'In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . .' " (*California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist., supra,* 14 Cal.4th 627, 634.) "Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction." (*California School Employees Assn.* v. *Governing Board* (1994) 8 Cal.4th 333, 340 [33 Cal.Rptr.2d 109, 878 P.2d 1321]; *Ladd* v. *County of San Mateo* (1996) 12 Cal.4th 913, 921 [50 Cal.Rptr.2d 309, 911 P.2d 496]; *California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].)

---

[3]Hughes also urges that the statutes *unambiguously* permit discipline of a holder of a license *only* for postlicensure wrongful conduct, because the wrongful acts must be committed "in the practice of architecture," defined as "offering or performing, or being in responsible control of, professional services which require the *skills of an architect*" in the planning of sites and the design of buildings or structures (§ 5500.1, subd. (a), italics added). Therefore, according to Hughes, one may not be engaged in the practice of architecture without being an *architect*, that is, "a person who is licensed to practice architecture in this state under the authority of this chapter." (§ 5500.)

The difficulty with Hughes's argument is that offering or performing professional services requiring the skills of an architect in the planning of sites and the design of buildings, and being an architect, are not the same thing. One who offers or performs such professional services without a license is engaged in the practice of architecture although he or she does not satisfy the definition of "architect" provided by section 5500. In the present case, Hughes committed the wrongful acts during the time he offered to perform, and did perform, professional services that required the skills of an architect in the planning of sites and the design of buildings. Thus, Hughes was engaged in the practice of architecture when he committed the wrongful conduct.

■ Neither of the two statutes in question explicitly authorizes the Board to discipline a licensee based upon wrongful conduct arising prior to licensure, but neither does the statutory language expressly limit the Board to imposing disciplinary measures on a holder of a license only if the wrongful conduct occurred following licensure. Moreover, in contrast with several of the other sections of article 5 defining the acts or omissions that may constitute grounds for discipline, each of the two sections specifies that the holder of a license "has been guilty," employing the past tense rather than the present tense in referring to the conduct involved. ■ In construing statutes, the use of verb tense by the Legislature is considered significant. (*People* v. *Loeun* (1997) 17 Cal.4th 1, 10-11 [69 Cal.Rptr.2d 776, 947 P.2d 1313]; see *United States* v. *Wilson* (1992) 503 U.S. 329, 333 [112 S.Ct. 1351, 1353-1354, 117 L.Ed.2d 593].) That circumstance renders it likely that the Legislature intended these statutes to apply to conduct occurring prior to licensure, but it does not, standing alone, appear to negate the plausibility of the opposite interpretation.

■ A statute is regarded as ambiguous if it is capable of two constructions, both of which are reasonable. (*Fiol* v. *Doellstedt* (1996) 50 Cal.App.4th 1318, 1328 [58 Cal.Rptr.2d 308]; *San Bernardino Valley Audubon Society* v. *City of Moreno Valley* (1996) 44 Cal.App.4th 593, 601 [51 Cal.Rptr.2d 897].) In view of the statutory language itself and the contrasting but reasonable interpretations the parties have derived from that language, it appears that the statutes must be considered to be ambiguous.

When, as in this case, a statute is ambiguous, we typically consider evidence of the Legislature's intent beyond the words of the statute. The court may examine a variety of extrinsic aids, including the statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality, "in an attempt to ascertain the most reasonable interpretation of the measure." (*Watts* v. *Crawford* (1995) 10 Cal.4th 743, 751 [42 Cal.Rptr.2d 81, 896 P.2d 807]; *Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 828 [25 Cal.Rptr.2d 148, 863 P.2d 218]; *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154]; *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 816-817 [226 Cal.Rptr. 81, 718 P.2d 68].)

■ In order to determine whether the interpretation advanced by Hughes and the Court of Appeal—or instead that of the Board—is the more reasonable estimation of legislative intent, we examine more specifically the statutory scheme, of which these sections are a part, pertaining to architectural applicants and licensees. We also examine the related sections of the

broader statutory scheme pertaining to business and professional licenses generally.

In concluding that sections 5583 and 5584 may not be invoked to discipline a licensee based upon wrongful conduct that occurred prior to licensure, the Court of Appeal emphasized the separation of the procedural subject matter of the Act into several articles within the Act. The Court of Appeal determined that article 4 governed denial of a license, thus controlling prelicensure wrongful conduct, and that article 5 governed discipline of a licensee by suspension or revocation of a license, thus controlling only postlicensure wrongful conduct. Accordingly, the Court of Appeal concluded that the placement of sections 5583 and 5584 within article 5 evidenced a legislative intent to limit temporally the grounds afforded by those sections, for suspension or revocation of a license, only to wrongful conduct that arises following issuance of a license.

A review of the pertinent sections included within articles 4 and 5 does not support the appellate court's interpretation. As described above, article 4 provides specific criteria for application for a license, including grounds for denial of such application, in the course of delineating the procedures for issuance of a license. On the other hand, article 5 not only provides specific grounds pursuant to which the Board may take "disciplinary action" consisting of suspension, revocation, or in certain cases imposition of a fine against a licensee, but also provides specific grounds pursuant to which the Board may take measures other than "disciplinary action," whether against licensees or nonlicensees. (In the case of the latter, appropriate measures may include denial of a license.) Thus, those articles do not appear to contemplate that the application of each article is exclusive with regard, respectively, to prelicensure and postlicensure conduct.

The following sections within article 5 implicitly or explicitly confirm that conclusion. Section 5560, authorizing the Board temporarily to suspend or permanently to revoke the license of any architect who *is guilty of or commits* any of the acts or omissions constituting grounds for disciplinary action under "this chapter," suggests by that language that the acts or omissions constituting such grounds may have occurred prior to as well as following licensure. That section does not specify that the status of "architect," that is, a person licensed to practice architecture pursuant to the authority of the chapter (§ 5500), must exist contemporaneously with his or her guilt of (or commission of) the acts or omissions subject to discipline. Similarly, section 5561, providing a lengthy period of limitations in which the Board must act upon an accusation, does not specify that the grounds for the accusation are confined to matters arising only after the architect has been licensed.

Section 5577 provides that the conviction of a crime substantially related to the qualifications, functions, and duties of an architect may be a ground for disciplinary action against "the holder of a license." The section authorizes the Board to suspend, revoke, or *decline to issue* a license to one convicted of such an offense at the appropriate procedural stage (expiration of time for appeal, affirmance on appeal, or grant of probation and suspension of imposition of sentence), thus presumably encompassing those individuals who have not yet become licensees. The placement of such authorization pertaining to applicants within article 5 is inconsistent with the conclusion that that article was intended to apply only to those individuals who have attained the status of licensees.

Section 5578 provides: "The fact that the holder of a license is practicing in violation of the provisions of this *chapter* constitutes a ground for disciplinary action." (Italics added.) That language is consistent with the conclusion that article 5 confers upon the Board authority to take disciplinary action against the holder of the license based upon conduct described in other articles, including article 4, that are also within the chapter.

In addition, article 5 includes sections pursuant to which the Board may issue a citation and take other measures, against either an unlicensed individual or a licensee, that do not rise to the level of "disciplinary action." The Board, having investigated the actions of any architect, may suspend or revoke the license of one who has committed an act or omission constituting a ground for discipline (§§ 5560, 5565), *or*, when it has probable cause to conclude that the individual has violated any of the provisions of the *chapter*, may issue a citation to a licensee (or an unlicensed individual acting in the capacity of an architect) (§ 5566). Such a citation may contain an assessment of a civil penalty (§ 5566), and, following exhaustion of the procedures for review, the Board may apply in superior court for a judgment in the amount of the civil penalty (§ 5566.2, subd. (d)).

Once a citation has issued, the statutes provide for an informal conference, a decision by the "executive officer" affirming or modifying the citation and (if present) the proposed assessment of a civil penalty, and (if that decision is contested) a hearing and decision by the Board. (§ 5566.2, subds. (a)-(c).) It is only the individual's failure to comply with the provisions of the decision or failure to pay any assessed penalty that is deemed to constitute a ground for *discipline* of that individual under these circumstances. (§ 5566.2, subds. (c), (e).) Therefore, the citation, and any civil penalty assessed pursuant to section 5566, clearly are not themselves a form of discipline, but rather are designed as more moderate measures, taken to correct acts or omissions by a licensee or unlicensed individual, and initiated *in lieu of* discipline.

In view of the Board's broad authority under article 5 either to take "disciplinary action" against licensees, or to take the above described alternative measures against both licensed and unlicensed persons, it appears that that article is not directed solely at postlicensure wrongful conduct but, rather, simply at wrongful conduct, whether occurring prior to or following licensure. In light of these sections, it does not appear that the Legislature intended the provisions of article 5 to be limited only to discipline following licensure. Nor does it appear that the Legislature intended the provisions of article 5 specifically relating to disciplinary action to apply only to conduct following acquisition of a license.[4]

In concluding that sections 5583 and 5584 may not be invoked to discipline a licensee based upon wrongful conduct arising prior to licensure, the Court of Appeal also noted a lack of reciprocity between article 4 and article 5. The court emphasized that within article 4, both section 5552, subdivision (a) (considered together with section 480, subdivision (a)(3), to which it refers), and section 5553 expressly provide that conduct which, if committed by a licensee, would be a ground for suspension or revocation of a license, also may be the basis for denial of a license to *an applicant*. The court observed that within article 5, no similar section provides that conduct which, if committed by an applicant, would be a ground for denial of a license, also may be the basis for suspension or revocation of a license of a *licensee*.

The statutory scheme does not support the view that, because of the absence of such reciprocal provisions in articles 4 and 5, discipline of a licensee must be limited to postlicensure wrongful conduct. Within article 4, section 5552 provides that an applicant for a license *shall* (a) not have committed acts constituting grounds for denial of a license under section 480, subdivision (a). That statute specifies, in subpart (2), that the applicant shall not have "[d]one any act involving dishonesty, fraud or deceit with the intent to substantially benefit himself . . . ." As noted above, within article 5, section 5578 provides that a holder of a license may be subject to discipline if he or she "is practicing in violation of the provisions of this chapter." Therefore, the holder of a license who has committed acts involving dishonesty, fraud, or deceit with the intent to obtain substantial personal

---

[4]Although, as the Court of Appeal indicated, certain sections within article 5 do appear to apply exclusively to liability arising after licensure (§§ 5588 [requirement that professional liability insurer send report to the Board within 30 days of settlement or arbitration award in excess of $5,000 on claim against license holder for fraud, deceit, negligence, incompetency, or recklessness in practice]; 5590 [requirement that a court of this state report to the Board, within 10 days of judgment, that license holder has committed a crime or is liable for death, personal injury, or property loss caused by his or her fraud, deceit, negligence, incompetency, or recklessness in practice]), that circumstance does not compel the conclusion that all provisions within article 5 apply only to postlicensure wrongful conduct.

benefit, such as prior to licensure representing that he or she is a licensed architect, or applying to his or her own work the architectural stamps belonging to other individuals, must be considered to be practicing in violation of section 5552, subdivision (a), which precludes even an *application* for a license when prior commission of those acts has occurred. The circumstance that the two articles do not contain corresponding sections employing substantially similar language does not compel the conclusion that the Legislature intended that the wrongful conduct of an individual who applies for a license may not provide a basis for the Board to discipline that individual as a licensee.[5]

Because the statutes are ambiguous, it also is appropriate to examine their legislative history, including the historical development of the Act. (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 830 [15 Cal.Rptr.2d 679, 843 P.2d 624]; see *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 250 [279 Cal.Rptr. 325, 806 P.2d 1360].) The results of that examination further undermine the position that articles 4 and 5 were intended separately and exclusively to address prelicensure and postlicensure wrongful conduct, respectively.

The Legislature, having enacted the Business and Professions Code in 1937 (Stats. 1937, ch. 399, p. 1229), in 1939 added chapter 3 on architecture to division 3 of that code (Stats. 1939, ch. 33, § 1, p. 340). At the time it was added, chapter 3 was divided into separate articles, which, as they presently do, included article 4 concerning issuance of certificates of registration (now licenses) (Stats. 1939, ch. 33, § 1, p. 344, adding former §§ 5550-5556) and

---

[5]Within certain statutory schemes governing other professions or occupations, the Legislature in more recent times has included language expressly authorizing the licensing entity to suspend or revoke a license on the basis of conduct that would have warranted denial of the application for a license. (See, e.g., §§ 10177 ["The commissioner may suspend or revoke the license of any real estate licensee, or may deny the issuance of a license to an applicant, who has done . . . any of the following: [¶] . . . [¶] (f) Acted or conducted himself or herself in a manner which would have warranted the denial of his or her application for a real estate license . . . ."]; 1670 & 1680, subd. (x) [dentists]; 3401, subd. (m) [hearing aid dispensers]; 7510.1, subds. (e) & (i) [repossessors]; 7561.1, subds. (d) & (*l*) [private investigators].) In the context of the real estate licensing scheme, it has been recognized that, because one of the general purposes of the regulatory power is to "ensure the holders of state licenses will be honest and truthful in their dealings and will maintain a good reputation" (*Stickel v. Harris* (1987) 196 Cal.App.3d 575, 588 [242 Cal.Rptr. 88]), the regulatory power operates within broad chronological and substantive boundaries in order to promote that purpose. "It has thus been held that conduct within the statutes may form the basis for discipline even 'though occurring before the issuance of the license which is the subject of a particular suspension or revocation.' " (*Id.* at pp. 588-589, citing *Grand v. Griesinger* (1958) 160 Cal.App.2d 397, 410-411 [325 P.2d 475].) Even taking into consideration the absence of a specific analogous provision in the Act, in view of the similarity in these statutory schemes it is not apparent why architects should be treated differently from other licensees such as real estate professionals. (See *People v. Woodhead, supra,* 43 Cal.3d 1002, 1008-1009.)

article 5 concerning disciplinary proceedings (Stats. 1939, ch. 33, § 1, pp. 344-346, adding former §§ 5570-5578).[6]

At the time of its enactment, the Act contemplated that, following an individual's successful examination, a "district board" initially would issue him or her a "provisional certificate" (Stats. 1939, ch. 33, § 1, p. 344, adding former §§ 5550, 5551), that the holder of such a provisional certificate could practice architecture until the time of the next annual meeting of the "State board" (the Board) (*id.*, adding former § 5552), and that, in the event no charges of dishonest practice, deception in obtaining a certificate, gross incompetence in practice, or "any other violation of the provisions of this chapter" had been substantiated, the holder of a provisional certificate was entitled to a "final certificate" issued by the Board (*id.*, adding former § 5553). At that time, the Act also directed that "any form of" certificate, whether provisional or final, could be suspended or revoked (*id.*, p. 344, adding former § 5570) for, among other reasons, dishonest practice, deception in obtaining a certificate, gross incompetence in practice, or "any violation of the provisions of this chapter" (*id.*, p. 345, adding former § 5578). Thus, it appears that at the time the Act first was enacted, revocation or suspension could be invoked not only to discipline the holder of a final certificate, but also to prevent the holder of a provisional certificate from seeking or obtaining a final certificate.

In 1941, the Act was amended. (Stats. 1941, ch. 831, p. 2379.) At that time, within article 4, former sections 5550, 5551, and 5552 continued to authorize the issuance of a provisional certificate by a district board and the temporary practice of architecture by the holder of such a certificate, and former section 5553 continued to provide that the holder of a provisional certificate who had not engaged in dishonest practice, resorted to deception in obtaining any form of certificate, or violated any of the provisions of the chapter could be issued a final certificate by the Board.

Within article 5, the Legislature added or amended sections 5560 through 5577. Newly added section 5560 authorized the Board to investigate "any" architect and suspend or revoke the certificate, whether provisional or final, of "any" architect. Newly added section 5561 provided that a complaint against the holder of "any" certificate, alleging an act constituting cause for disciplinary action, must be filed with the Board within two years of commission of the act. Newly added section 5565 authorized the Board to issue a disciplinary decision that immediately, eventually, or conditionally suspended or revoked the holder's certificate. The 1941 changes also repealed former section 5578 and replaced it with sections 5578 through 5587.

---

[6]In 1985, the Legislature amended provisions of the chapter to replace references to "certificate" with "license." (Stats. 1985, ch. 1223, p. 4163 et seq.)

(Stats. 1941, ch. 831, § 2, p. 2380 et seq.) In its new version, section 5578 provided that violation of the provisions of the chapter constituted a ground to discipline the holder of a certificate. The additional sections, including the two sections at issue in the present case, separately stated the other grounds for discipline in substance as we have described their current versions. Thus, these grounds for disciplinary action could be asserted against the holder of either a provisional or a final certificate.

In 1945, the Act further was amended to abolish the process of provisional certification. (Stats. 1945, ch. 1231, §§ 4, 5, p. 2341.) Within article 4, sections 5550 and 5551 were amended to require that an individual seeking to practice architecture file an application and take an examination, and that the Board issue a "certificate to practice architecture," provided that the applicant met the qualifications of education and experience, the applicant's examination was satisfactory, and no charges had been filed with the Board alleging that the applicant had resorted to deception in obtaining the certificate or committed any other violation of the provisions of the chapter. Former sections 5552 and 5553 were repealed. (Stats. 1945, ch. 1231, § 14, p. 2343.)

Within article 5, section 5560 was amended to delete references to the provisional certificate and section 5561 was amended to modify references to accusations against the holder of "any certificate" to accusations against the holder of "a certificate." (Stats. 1945, ch. 889, §§ 1, 2, p. 1655; id., ch. 1231, §§ 8, 9, p. 2342.) Section 5578 provided, as before, that the holder of a certificate could be disciplined for violation of the provisions of the chapter, and sections 5579 through 5587, separately stating other particular grounds for discipline, generally remained unchanged.

In 1957, the Act was amended further. (Stats. 1957, ch. 299, p. 943.) Within article 4, a new section 5552 was enacted, this time to set forth the requirements that an applicant be "of good character" (a requirement subsequently replaced by one excluding potential applicants who had committed acts or crimes constituting grounds for denial of a certificate pursuant to section 480 (Stats. 1978, ch. 1161, § 295, p. 3682) and furnish evidence of the requisite educational training and experience. (Stats. 1957, ch. 299, § 3, p. 944.) A new section 5553 was enacted, this time to provide for denial of the certificate if the applicant had committed any acts that would be grounds for suspension or revocation if done by the holder of a certificate. (Stats. 1957, ch. 299, § 4, p. 944.)

Within article 5, section 5560 remained unchanged and section 5561 was amended to extend the period of limitations—if the ground for discipline

consisted of fraud in obtaining the certificate—to three years following the Board's discovery of the fraud. Section 5577 was added, providing that the conviction of a felony by the holder of a certificate in connection with the practice of architecture constituted a ground for disciplinary action and that a "conviction" encompassed a plea of guilty or of nolo contendere. (Stats. 1957, ch. 299, § 6, p. 945.) The then existing grounds for discipline (§§ 5578-5587), other than the modification of certain language in section 5587, remained unchanged.

It is clear from the historical development of articles 4 and 5 that they were not designed to address, respectively, only prelicensure and postlicensure wrongful conduct. Rather, it appears that originally, article 4 contemplated an initial phase of temporary licensing, and article 5 provided for disciplinary action not only following the acquisition of the final license but during this provisional stage as well, based upon conduct that might predate even the acquisition of the provisional license. Although the provisional and final stages of licensure subsequently were deleted and only one stage of licensure thereafter was recognized, none of the statutory modifications or additions appear directed at circumscribing the temporal reach of the disciplinary provisions of article 5. These circumstances support a construction of the particular sections within article 5 at issue in the present case in a manner that does not limit their application to only postlicensure wrongful conduct.[7]

---

[7]Without examining the general historical development of these articles, the Court of Appeal determined that the legislative history attending the recent enactment of section 5586 (Stats. 1994, ch. 258, § 2) supported its interpretation of sections 5583 and 5584 as applicable only to postlicensure wrongful conduct, because otherwise the Legislature would have had no need to enact that new section. Section 5586 specifies that the circumstance that a "holder of a license has had disciplinary action taken by any public agency for any act substantially related to the qualifications, functions, or duties as an architect constitutes a ground for disciplinary action." The Court of Appeal observed that, prior to its passage, the legislation was described as follows: "The sponsor [the Board] contends that currently if an architect, licensed to work in California and another state, works in another state, and that work is found to be in violation of that state's requirements, because the work did not occur in California, there is no action that can be taken by the Board of Architectural Examiners. This bill would allow for such an action." (Assem. Com. on Consumer Protection, Analysis of Assem. Bill No. 2702 (1993-1994 Reg. Sess.) as introduced Feb. 7, 1994.) As the Board has pointed out, other legislative materials refer to the circumstance that the measure was enacted to permit the Board to discipline an architect licensed in this state solely based upon the circumstance that discipline was imposed in another state, without the necessity of establishing separately, by independent factual findings, a violation of the Act. (E.g., Sen. Com. on Business & Professions, Analysis of Assem. Bill No. 2702 (1993-1994 Reg. Sess.) as introduced Feb. 7, 1994.) It appears the enactment of section 5586 was motivated by a need for efficient use, when appropriate, of the disciplinary determination of another agency similarly authorized in another jurisdiction, rather than by a purported need to grant authority to the Board that it did not then possess, to discipline a licensee based upon particular conduct

■ We next examine the statutory purpose of the provisions in question. Early in this century, decisions interpreting analogous regulatory statutes authorizing administrative actions to revoke or suspend a professional or vocational license in a given field often characterized such statutes and related proceedings as being penal in nature. (See, e.g., *Schomig* v. *Keiser* (1922) 189 Cal. 596, 598 [209 P. 550] [Real Estate Brokers' Act authorizing forfeiture of license of broker or salesman was "highly penal in its nature"]; *Abrams* v. *Daugherty* (1922) 60 Cal.App. 297, 304 [212 P. 942] [proceeding to revoke stockbroker's license]; *Fuller* v. *Board of Medical Examiners* (1936) 14 Cal.App.2d 734, 742 [59 P.2d 171] [provision of Medical Practice Act invoked in proceeding against physician].) That characterization yielded the conclusion that such statutes should be strictly construed. (*Schomig* v. *Keiser*, *supra*, 189 Cal. 596, 598 [act "should not be construed to include anything which is not embraced within its terms"]; *Fuller* v. *Board of Medical Examiners*, *supra*, 14 Cal.App.2d 734, 742 [discipline provision was subject to construction with degree of strictness commensurate with severity of penalty].)[8]

In 1941, however, within several years of the enactment of the modern Business and Professions Code, this court in *Webster* v. *Board of Dental Examiners* (1941) 17 Cal.2d 534 [110 P.2d 992] (*Webster*) reviewed the accuracy of that general characterization. In *Webster*, we addressed the claim that, because a disciplinary proceeding is quasi-criminal in nature, the rules regarding the burden and quantum of proof should be analogous to those applicable to a criminal proceeding. Although we observed that an analogy between a proceeding to revoke a license and a criminal trial was recognized in a number of the earlier cases, we noted that in those instances the

occurring in another jurisdiction. Analogous statutes applicable to other professions have been similarly interpreted. (*Marek* v. *Board of Podiatric Medicine* (1993) 16 Cal.App.4th 1089, 1096-1098 [20 Cal.Rptr.2d 474] [interpreting § 2305]; *Clare* v. *State Bd. of Accountancy* (1992) 10 Cal.App.4th 294, 304-306 [12 Cal.Rptr.2d 481] [interpreting § 5100, subd. (g)].)

[8]In contrast, this court long has recognized the noncriminal nature of a disciplinary proceeding under the State Bar Act. Although an accusation has been characterized as being in the nature of a criminal charge, and a proceeding on such a charge has been characterized as a quasi-criminal action, proceedings for disbarment uniformly have been treated " 'as peculiar to themselves, and governed exclusively by the code sections specifically covering them.' [Citation.] The purpose of such a proceeding is to determine the fitness of an officer of the court to continue in that capacity, and it has been said the disbarment of attorneys is not intended for the punishment of the individual but for the protection of the courts and the legal profession." (*In re Vaughan* (1922) 189 Cal. 491, 496 [209 P. 353, 24 A.L.R. 858].) Accordingly, our cases have recognized that the rules applicable to criminal cases do not apply, and we have rejected penal-based claims such as that an accused attorney cannot be compelled to testify against himself or herself. (*Id.* at pp. 495-496; see *Fish* v. *The State Bar* (1931) 214 Cal. 215, 222 [4 P.2d 937]; see also *Johnson* v. *State Bar* (1935) 4 Cal.2d 744, 752 [52 P.2d 928].)

Legislature had "provided for forfeiture of the professional license as an extra penalty to be added by the criminal court after a conviction for violation of the statute." (*Id.* at p. 537, citing *Cavassa* v. *Off* (1929) 206 Cal. 307, 312 [274 P. 523]). We further observed that "language describing the revocation of a license as penal in nature is entirely inapplicable to an administrative proceeding . . . ." (*Webster, supra,* 17 Cal.2d 534, 537.) We also recognized that, when "the legislature has created a professional board and has conferred upon it power to administer the provisions of a general regulatory plan governing the members of the profession, the overwhelming weight of authority has rejected any analogy which would require such a board to conduct its proceedings for the revocation of a license in accordance with theories developed in the field of criminal law." (*Webster, supra,* 17 Cal.2d at pp. 537-538, citing *Suckow* v. *Alderson* (1920) 182 Cal. 247 [187 P. 965]; *Lanterman* v. *Anderson* (1918) 36 Cal.App. 472 [172 P. 625], and numerous out-of-state decisions.)

Following *Webster,* several decisions recognized that such administrative proceedings are not intended to punish the licensee, but rather to protect the public. In *West Coast etc. Co.* v. *Contractors' etc. Bd.* (1945) 72 Cal.App.2d 287 [164 P.2d 811], for example, the court, relying upon *Webster,* and deriving its holding by analogy to early State Bar Act cases, rejected the contention that a licensed contractor is not required to testify in disciplinary proceedings. The court noted that "the purpose of a disciplinary proceeding . . . is to determine the fitness of a licensed contractor to continue in that capacity. It is not intended for the punishment of the individual contractor, but for the protection of the contracting business as well as the public by removing, in proper cases, either permanently or temporarily, from the conduct of a contractor's business a licensee whose method of doing business indicates a lack of integrity upon his part or a tendency to impose upon those who deal with him." (72 Cal.App.2d at pp. 301-302.)

Subsequent decisions by the Courts of Appeal have held to the same effect with respect to a variety of professions, vocations, and businesses. (See, e.g., *Murrill* v. *State Board of Accountancy* (1950) 97 Cal.App.2d 709, 712 [218 P.2d 569] [revocation of an accountant's license "is not penal in any respect, and its only purpose is to protect the public from incompetence and lack of integrity in those practicing trades and professions"]; *Kendall* v. *Bd. of Osteopathic Examiners* (1951) 105 Cal.App.2d 239, 248-249 [233 P.2d 107] [proceeding to revoke license of a non-drug-dispensing practitioner is not criminal in nature]; *Cornell* v. *Reilly* (1954) 127 Cal.App.2d 178, 184 [273 P.2d 572] [proceeding to revoke liquor license is not for the primary purpose of punishment but "to protect the public, that is, to determine whether a licensee has exercised his privilege in derogation of the public interest, and

to keep the regulated business clean and wholesome"]; *Furnish* v. *Board of Medical Examiners* (1957) 149 Cal.App.2d 326, 331 [308 P.2d 924] [revocation or suspension of a license to practice medicine is not penal, but is intended "to protect the life, health and welfare of the people at large"]; *Ready* v. *Grady* (1966) 243 Cal.App.2d 113, 116 [52 Cal.Rptr. 303] [proceeding to revoke insurance agent's licenses was not criminal but had as its purpose the protection of the public].)

In the wake of these decisions recognizing the foregoing purpose of licensing statutes and related proceedings in other occupations and professions, the Legislature prefaced certain amendments to the Act with an uncodified section expressly stating its intent to protect the public health, safety, and welfare (Stats. 1963, ch. 2133, § 1, p. 4432), and subsequently added to the Act a separate code section declaring its intent that the mandate of the Board be to regulate the practice of architecture in the interest and for the protection of the public health, safety, and welfare (§ 5510.1, as added by Stats. 1985, ch. 1223, § 2, p. 4163). The Legislature's stated purpose is analogous to that repeatedly and consistently recognized in the licensing laws applicable to numerous other professions and occupations. (See, e.g., *Viking Pools, Inc.* v. *Maloney, supra,* 48 Cal.3d 602, 606 [intent of contractors licensing statutes is to protect the public from the perils of contracting with dishonest or incompetent contractors]; *Bryce* v. *Board of Medical Quality Assurance* (1986) 184 Cal.App.3d 1471, 1476 [229 Cal.Rptr. 483] [purpose of physician discipline is to " 'protect the life, health and welfare of the people at large and to set up a plan whereby those who practice medicine will have the qualifications which will prevent, as far as possible, the evils which could result from ignorance or incompetency or a lack of honesty and integrity' "]; *Murrill* v. *State Board of Accountancy, supra,* 97 Cal.App.2d 709, 712 [purpose of license revocation is to protect the public from incompetence and lack of integrity in those practicing trades and professions].)

As we recently reiterated in *Viking Pools, Inc.* v. *Maloney, supra,* 48 Cal.3d 602, 607, footnote 4, if the purpose of a licensing statute is not to punish but to serve another legitimate governmental purpose, such as protecting the consumers and the public who deal with members of a particular profession or trade, the statute is considered nonpenal. Accordingly, we conclude that the Act before us is nonpenal in nature. As we also observed in *Viking Pools,* when the Legislature's intent is to protect the health, safety, and welfare of the public rather than to serve punitive interests, that body additionally intends, in order to protect the public, that the law be interpreted broadly so that particular licensees not be able easily to evade the statute's protective purposes. (*Id.* at pp. 606-607.) ■ Considering the statutory

scheme at issue in the present case, which evidences such a legislative intent to protect the public health, safety, and welfare, we construe the statutes broadly to preclude architects (and those holding themselves out as such) from evading the protective purposes of the Act.

In general terms, decisional law long has recognized the authority of a governmental licensing entity to examine and determine, from the past conduct of a party, his or her fitness to undertake or continue a business or profession. (*McDonough* v. *Goodcell* (1939) 13 Cal.2d 741, 749-751 [91 P.2d 1035, 123 A.L.R. 1205] [affirming denial, based upon past conduct, of bail bondsmen's licenses to individuals who long had conducted bail bond business prior to enactment of Bail Bond Regulatory Act]; *Foster* v. *Police Commissioners* (1894) 102 Cal. 483, 490-493 [37 P. 763] [affirming validity of ordinance authorizing denial of license to sell liquor based upon conduct (employment of females to wait on customers) not then prohibited by law, occurring prior to issuance of license]; *Murrill* v. *State Board of Accountancy*, *supra*, 97 Cal.App.2d 709, 711 [upholding revocation of accountant's license based upon conviction of offense committed prior to enactment of Accountancy Act].) As we have observed, past conduct of this nature furnishes evidence of the unfitness of such persons as a class and is no less conclusive for having occurred prior to the inception of the authority under which it is examined. (See *McDonough* v. *Goodcell*, *supra*, 13 Cal.2d 741, 749-752; *Foster* v. *Police Commissioners*, *supra*, 102 Cal. 483, 490-492.)

In common with numerous other statutory licensing schemes, the Act provides that conviction of a felony substantially related to the performance of his or her professional obligations is a ground for discipline of a licensed individual. (§ 5577). Presumably, that is because such a conviction is *evidence* of the unfitness to practice of the person convicted. (See *Foster* v. *Police Commissioners*, *supra*, 102 Cal. 483, 492-493; cf. *Ready* v. *Grady*, *supra*, 243 Cal.App.2d 113, 115-117 [expungement of conviction does not justify automatic reinstatement of license to sell insurance; affirmative showing of rehabilitation is required]; *Epstein* v. *California Horse Racing Board* (1963) 222 Cal.App.2d 831, 835, 836-841 [35 Cal.Rptr. 642] [expungement of prior conviction does not prevent State Horse Racing Board from excluding petitioner from racing premises; basis for expulsion is the circumstances of the conduct resulting in conviction, rather than the conviction itself].)

In the same manner as provisions such as section 5577 (specifying that a conviction may be the basis for disciplinary action), sections 5583 and 5584, construed to apply to conduct occurring prior to licensure, consider wrongful conduct predating licensure as evidence of a licensee's unfitness to practice

architecture. There is no reason why these sections may not be so applied in order to protect the public welfare when it is learned, following licensure, that an architect previously committed acts of wrongful conduct that constitute evidence of unfitness to practice that profession.

■ Finally, we examine several points made regarding the need to construe these statutory provisions in a manner consistent with constitutional principles. A presumption exists that in enacting a statute, the Legislature did not intend it to violate the Constitution, but instead intended to enact a valid statute within the scope of its constitutional powers. (*People* v. *Superior Court (Romero)* (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628]; *Ector* v. *City of Torrance* (1973) 10 Cal.3d 129, 133 [109 Cal.Rptr. 849, 514 P.2d 433]; *Miller* v. *Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297].) Therefore, we frequently have observed that a statute must be interpreted in a manner, consistent with the statute's language and purpose, that eliminates doubts as to the statute's constitutionality. (*Building Industry Assn.* v. *City of Camarillo, supra,* 41 Cal.3d 810, 816-817; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142].)

■ Hughes contends that, as the United States Supreme Court and this court often have recognized, the right to pursue one's chosen profession is a fundamental liberty protected by the due process clauses of the Fifth and Fourteenth Amendments, and that therefore his license, once obtained, may not be revoked based upon prelicensure wrongful conduct. ■ It is axiomatic that the right of an individual to engage in any of the common occupations of life is among the several fundamental liberties protected by the due process and equal protection clauses of the Fourteenth Amendment. (See *Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232, 238-239 [77 S.Ct. 752, 755-756, 1 L.Ed.2d 796, 64 A.L.R.2d 288]; *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399 [43 S.Ct. 625, 626-627, 67 L.Ed. 1042, 29 A.L.R. 1446]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 145, fn. 12 [93 Cal.Rptr. 234, 481 P.2d 242].) Therefore, for example, a statute constitutionally can prohibit an individual from practicing a lawful profession only for reasons related to his or her fitness or competence to practice that profession. (*Arneson* v. *Fox* (1980) 28 Cal.3d 440, 448 [170 Cal.Rptr. 778, 621 P.2d 817], *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254]; *Cartwright* v. *Board of Chiropractic Examiners* (1976) 16 Cal.3d 762, 767 [129 Cal.Rptr. 462, 548 P.2d 1134].)

Consistent with that basic proposition, in the context of a variety of professions and vocations, we often have recognized that an individual,

having obtained the license required to engage in a particular profession or vocation, has a "fundamental vested right" to continue in that activity. (*Unterthiner* v. *Desert Hospital Dist.* (1983) 33 Cal.3d 285, 296-297 [188 Cal.Rptr. 590, 656 P.2d 554] [physician licensed to practice medicine has a vested right to practice his profession]; see, e.g., *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 823 [140 Cal.Rptr. 442, 567 P.2d 1162] [physician has a fundamental vested right to continue to practice in a hospital]; *Laisne* v. *Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 835 [123 P.2d 457] [right to practice optometry is a vested property right]; *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 84 [87 P.2d 848] [funeral director's and embalmer's licenses characterized as "existing valuable privilege[s]"].)

■ A licensee, having obtained such a fundamental vested right, is entitled to certain procedural protections greater than those accorded an applicant. For example, this court repeatedly has held, with exceptions not pertinent here, that the "independent judgment" standard of review must be applied to an administrative decision that substantially affects such a fundamental vested right. (See, e.g., *Anton* v. *San Antonio Community Hosp.*, *supra*, 19 Cal.3d 802, 820-825; *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29]; *Bixby* v. *Pierno*, *supra*, 4 Cal.3d 130, 144.)[9]

Nonetheless, as this court also has recognized, the circumstance that an individual has acquired a license, and thus that the right to practice the particular profession or vocation has vested, does not affect the due process analysis. "There is little similarity between the analysis applied in determining (1) whether a right is a 'fundamental right' for equal protection/due process purposes on the one hand, and (2) [whether a right is a 'fundamental right' for purposes of deciding] which [level of] scrutiny is applicable for administrative review purposes, on the other. The principle of 'fundamentality' differs depending on the context or analysis within which the concept arises." (*Berlinghieri* v. *Department of Motor Vehicles* (1983) 33 Cal.3d 392, 397 [188 Cal.Rptr. 891, 657 P.2d 383].)

"The term 'vested' has been used in a nontechnical sense to denote generally a right 'already possessed' (*Bixby* v. *Pierno*, *supra*, [4 Cal.3d 130,]

[9]Similarly, it has been held that procedural due process of law requires a regulatory board or agency to prove the allegations of an accusation filed against a licensee by clear and convincing evidence rather than merely by a preponderance of the evidence. (See, e.g., *Kapelus* v. *State Bar* (1987) 44 Cal.3d 179, 184, fn. 1 [242 Cal.Rptr. 196, 745 P.2d 917]; *Ettinger* v. *Board of Medical Quality Assurance* (1982) 135 Cal.App.3d 853, 856 [185 Cal.Rptr. 601]; see also *Coffman* v. *Board of Architectural Examiners* (1933) 130 Cal.App. 343, 347-348 [19 P.2d 1002].)

146) or 'legitimately acquired.' (*Strumsky* v. *San Diego County Employees Retirement Assn., supra*, [11 Cal.3d 28,] 34.) On this basis, this court has distinguished generally between applicants and recipients in determining whether a right is 'vested' *for the limited purpose of determining the applicable scope of review.*" (*Harlow* v. *Carleson* (1976) 16 Cal.3d 731, 735 [129 Cal.Rptr. 298, 548 P.2d 698], italics added.)

■ Therefore, the circumstance that a licensee is entitled to a higher standard of review or other procedural protections accorded by due process of law, because of his or her status as possessor of a fundamental vested right, does not compel the conclusion that the particular licensing board must limit disciplinary actions only to conduct occurring after licensure. "The general right to engage in a trade, profession or business is subject to the power inherent in the state to make necessary rules and regulations respecting the use and enjoyment of property necessary for the preservation of the public health, morals, comfort, order and safety; such regulations do not deprive owners of property without due process of law. [Citation.] No person can acquire a vested right to continue, when once licensed, in a business, trade or occupation which is subject to legislative control under the police powers. [Citations.]" (*Gregory* v. *Hecke* (1925) 73 Cal.App. 268, 283 [238 P. 787]; see *Frankel* v. *Board of Dental Examiners* (1996) 46 Cal.App.4th 534, 550-551 [54 Cal.Rptr.2d 128]; *Kenneally* v. *Medical Board* (1994) 27 Cal.App.4th 489, 497 [32 Cal.Rptr.2d 504]; *Murrill* v. *State Board of Accountancy, supra,* 97 Cal.App.2d 709, 711-712.)

■ Thus, although Hughes is correct that his status as a licensee entitles him to certain procedural protections consistent with a vested interest, he does not possess a substantive vested right to continue to pursue his occupation. Nor does his status as a licensee ensure that his license may not be revoked based upon his prelicensure wrongful conduct.

The Court of Appeal asserted that the Board's construction of sections 5583 and 5584 to permit disciplinary action based upon wrongful conduct arising prior to licensure would "cast a constitutional shadow over the Act" and "pose grave substantive due process questions." The appellate court observed that whenever (in the words of the court) a "citation for revocation of a license is filed," the citation may contain an assessment of a civil penalty (§ 5566), and, following exhaustion of the procedures for review, the Board may apply in superior court for a judgment in the amount of the civil penalty (§ 5566.2, subd. (d)) ranging from $50 to $2,000 for each violation (Cal. Code Regs., tit. 16, § 152). The Court of Appeal determined that construing sections 5583 and 5584 to permit the Board to seek revocation of a license based upon prelicensure wrongful conduct also would permit the

imposition of such a fine based upon conduct that occurred prior to licensure in another jurisdiction.

We do not perceive the "constitutional shadow" cast, nor the "grave substantive due process questions" posed, by a construction of these sections that permits the discipline of a licensee based upon prelicensure wrongful conduct. The Act does not contemplate that a "citation for revocation of a license" will be filed upon revocation of a license, nor that a fine that may be assessed, as a result of the citation, will be based upon revocation of the license.[10]

The Board may on its own motion, or must upon the filing of a complaint by any person, investigate the actions of any architect. (§ 5560.) Having investigated, it may suspend or revoke the license of one who has committed an act or omission constituting a ground for discipline (§§ 5560, 5565), *or* on probable cause it may issue a citation to a licensee (or to an unlicensed individual acting in the capacity of an architect) (§ 5566). The citation itself may not be issued until a Board designee has reviewed the matter, attempted to discuss and resolve the alleged violation with the licensed or unlicensed individual, made findings of fact and a recommendation, and concluded that probable cause exists. (§ 5566.)

As we have explained above in the part of our opinion considering whether articles 4 and 5 separately address prelicensure and postlicensure misconduct, it is only after a citation has issued, and the various other procedural steps have been taken, that a failure to comply with provisions of the decision or to pay any assessed penalty may constitute a ground for discipline. (§ 5566.2, subds. (c), (e).) As we have seen, the citation and any civil penalty provided are not themselves a form of discipline, but rather are corrective steps initiated *in lieu of* discipline. No constitutional violation arises from an interpretation of sections 5583 and 5584 (which themselves are part of the separate *disciplinary* portion of article 5) that permits consideration of prelicensure conduct.

Hughes contends that a construction of sections 5583 and 5584 permitting discipline based upon prelicensure wrongful conduct that occurred in another state would be inconsistent with precedent suggesting that the Legislature generally may not enact statutes applicable to incidents or transactions arising outside this state. (See *North Alaska Salmon Co.* v. *Pillsbury* (1916)

---

[10]The Court of Appeal did not suggest that the fine that may be imposed as a form of discipline pursuant to section 5565 against the holder of a license for a cause specified in section 5577 (conviction related to the practice of architecture) is unconstitutional. As discussed above, the conduct underlying such a conviction itself may predate licensure.

174 Cal. 1, 4 [162 P. 93].) Hughes emphasizes that his practice without a license in Virginia and Washington, D.C., did not harm any resident of (or property in) California.

As was recognized by the Court of Appeal, conduct occurring anywhere, that falls within the statutory grounds for *denial* of a license, may provide the basis for such denial without offending jurisdictional principles. It is obvious that the statutory provisions affording a basis for denial of a license because of prior convictions, dishonest conduct, or certain other conduct for which a licensee would be subject to discipline, apply whether the conduct occurred in this state or in another jurisdiction. The mere circumstance that the act occurring within the boundaries of another state or locality is being scrutinized at a different stage of the Board's administrative authority over the subject—that is, following licensure—does not undermine the agency's authority to act based upon the out-of-state conduct.

In this state and others, postlicensure disciplinary proceedings have been based upon acts that occurred prior to licensure and outside the state in which the individual was licensed. (See, e.g., *Windham* v. *Board of Medical Quality Assurance* (1980) 104 Cal.App.3d 461, 464 [163 Cal.Rptr. 566] [proceedings to revoke license of California physician following conviction based upon prelicensure filing of fraudulent tax returns in Mississippi]; *Office of Disciplinary Counsel* v. *Clark* (1988) 40 Ohio St.3d 81, 81 [531 N.E.2d 671] [disciplinary proceedings against attorney in Ohio following conviction based upon prelicensure trafficking in controlled substances in Virginia].) Although in these decisions, the disciplinary action was based upon the convictions that occurred following licensure, that circumstance did not affect the conclusion that the discipline meted out by one jurisdiction properly could be based upon conduct that occurred in another jurisdiction prior to licensure in the jurisdiction imposing that discipline. As we have discussed above, the decisional law has distinguished between the facts that in themselves justify discipline, giving rise to a conviction, and the conviction itself, which as a matter of law may be expunged from the licensee's or applicant's record.

In addition, the administrative licensing scheme applicable in the present case, as well as the licensing schemes applicable to a number of other professions, all provide that a California licensee who has suffered disciplinary action by an agency regulating the same profession in a different jurisdiction is subject to discipline in this state based solely upon the disciplinary determination of the other jurisdiction. (§ 5586; see, e.g., §§ 2305 [physicians], 2761, subd. (a)(4) [nurses], 5100, subd. (g); [accountants], 6049.1 [attorneys]; see also Annot., Disbarment or Suspension of

Attorney in One State as Affecting Right to Continue Practice in Another State (1977) 81 A.L.R.3d 1281.) If jurisdictional principles precluded the imposition of discipline upon a licensee in this state for conduct occurring outside the state, statutes of that nature also would offend those jurisdictional principles. Nonetheless, in reviewing such statutes, our courts have concluded otherwise. (*Marek* v. *Board of Podiatric Medicine, supra,* 16 Cal.App.4th 1089, 1097-1098; *Clare* v. *State Bd. of Accountancy, supra,* 10 Cal.App.4th 294, 303-306.)

Hughes contends that to construe the statutes to permit discipline of a current holder of a license for conduct occurring prior to issuance of the license would constitute impermissible retroactive application of the statutes. ■ " 'A statute is retroactive if it substantially changes the legal effect of past events. [Citations.] A statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment. [Citations.]' [Citation.] The rule is also stated: 'A retroactive statute is one which " 'affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute.' " [Citation.]' [Citations.] The theory against retroactive application of a statute is that the parties affected have no notice of the new law affecting past conduct. [Citation.]" (*Borden* v. *Division of Medical Quality* (1994) 30 Cal.App.4th 874, 879-880 [35 Cal.Rptr.2d 905]; *Fox* v. *Alexis* (1985) 38 Cal.3d 621, 627 [214 Cal.Rptr. 132, 699 P.2d 309].) ■ This theory obviously is inapplicable in the present case, in which the relevant statutes were enacted in essentially the same form in 1941, and the conduct that gave rise to Hughes's discipline by the Board occurred during the 1980's.

## III

■ Nor does the doctrine of equitable estoppel prevent the Board from disciplining Hughes based upon wrongful conduct arising prior to licensure. We previously have recognized that this doctrine ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy. (*Bib'le* v. *Committee of Bar Examiners* (1980) 26 Cal.3d 548, 553 [162 Cal.Rptr. 426, 606 P.2d 733]; *Hock Investment Co.* v. *City and County of San Francisco* (1989) 215 Cal.App.3d 438, 449 [263 Cal.Rptr. 665].) In the present case, Hughes has not demonstrated that grave injustice would result from the delay that occurred in imposing discipline. Application of the equitable estoppel doctrine would work to defeat the strong public policy of regulating the architectural profession so as to exclude from practice those individuals who, by their wrongful conduct, have demonstrated their unfitness to practice within this state. (See *Morrison* v. *California Horse Racing Bd.* (1988) 205 Cal.App.3d 211, 219 [252 Cal.Rptr. 293]

[equitable estoppel not applied when strong public policy underlies regulation of the types of persons permitted to wager on legitimate horse racing *and when the asserted unfairness resulting from the agency's delay in disciplining a licensee, based upon prelicensure misconduct, is slight*].)

 Moreover, the doctrine of equitable estoppel may be invoked only when the party to be estopped is apprised of the facts and intends that his or her conduct will be acted upon, and the other party is ignorant of the true facts and relies upon the conduct to his or her detriment. (See *Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264]; *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 489 [91 Cal.Rptr. 23, 476 P.2d 423].) It is evident that, at the time it issued the license, the Board did not have full knowledge of the circumstances giving rise to the allegations of out of state wrongful conduct, nor had it represented that it would not act to discipline the licensee based upon conduct arising prior to licensure. Under these circumstances, the doctrine may not be applied.

Similarly, the doctrine of collateral estoppel does not preclude the Board from disciplining Hughes based upon wrongful conduct arising prior to licensure. As we have observed in other cases, that doctrine prevents an administrative agency from reconsidering, in the absence of new facts, its prior final decision made in a judicial or quasi-judicial capacity in the context of an adversary hearing. (*Hollywood Circle, Inc.* v. *Dept. of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 731-733 [13 Cal.Rptr. 104, 361 P.2d 712]; *Aylward* v. *State Board etc. Examiners* (1948) 31 Cal.2d 833, 839 [192 P.2d 929]; see *People* v. *Sims* (1982) 32 Cal.3d 468, 481, 484-486 [186 Cal.Rptr. 77, 651 P.2d 321].) In issuing Hughes a license, the Board did not make a final determination, within the context of an adversary hearing, of his fitness to practice architecture based upon a review of his prelicensure misconduct. Nor did the Board, in issuing that license, have before it the complete record as subsequently developed during the disciplinary hearing. The doctrine of collateral estoppel is inapplicable in this context.

We caution that the Board may not, in reliance upon our decision here, simply defer to the postlicensure phase its examination of questions raised concerning an applicant's background, and that, in an egregious case, the doctrines of estoppel or laches might have application were the Board to delay inordinately its investigation of an application despite substantial questions raised at the licensing stage concerning the applicant's character or fitness. We believe, however, that these doctrines, considered together with the period of limitations imposed by statute upon the Board's authority to

file an accusation, sufficiently protect the licensee, and that the statutes here at issue properly may be construed to permit discipline for the prelicensure wrongful conduct committed in this case.

## IV

We reverse the judgment of the Court of Appeal and remand the matter to that court to permit it to decide the remaining issue that it previously did not consider—whether the Board imposed an excessive sanction in revoking Hughes's license. (*DaFonte* v. *UpRight, Inc.* (1992) 2 Cal.4th 593, 604-605 [7 Cal.Rptr.2d 238, 828 P.2d 140]; Cal. Rules of Court, rule 29.4(b).)

Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Croskey, J.,* concurred.

**MOSK, J.,** Dissenting.—Though the majority's goal of protecting the public is laudable, their solution may inadvertently achieve the opposite effect. It will allow the Board of Architectural Examiners to escape the consequences of disregarding its statutory mandate, punishing Hughes instead. The board concedes, moreover, that "[n]egligence is not an issue in this case." Rather, the issue is the tangled web Hughes wove for himself when first he practiced to deceive.

Hughes contends that the board improperly "appears to [assert] that it needs two bites at the apple—one at license time, another at discipline time—in order to be able to effectively deal with prelicense out-of-state misconduct . . . ." I agree. The Court of Appeal correctly held that the statutes Hughes purportedly violated do not apply to him.

Business and Professions Code section 5510.1 provides: "The Legislature finds and declares that it is the mandate of the board to regulate the practice of architecture in the interest and for the protection of the public health, safety, and welfare. For this purpose, the board shall delineate the minimum professional qualifications and performance standards for admission to and practice of the profession of architecture. *The board shall establish a fair and uniform enforcement policy to deter and prosecute violations of this chapter* or any rules and regulations promulgated pursuant to this chapter to provide for the protection of the consumer." (Italics added.)

By ordering the board to "establish a fair and uniform enforcement policy," the Legislature also meant for the board to enforce such a policy. (Bus. & Prof. Code, § 5526.) The board failed to comply.

---

*Associate Justice of the Court of Appeal, Second District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Hughes obtained his California license to practice architecture September 10, 1990. On his application, dated February 22 of that year, he checked a box on question No. 8 declaring that he had never "been convicted by a court of any offense."

The board found that in a follow-up letter to the board's examiners, sent March 8, 1990, Hughes "related some of his problems with his licensed status and [that] the criminal charges against him had been dismissed." "As a result," Hughes explained in the March 8 letter, "there are no charges pending against me nor will any other criminal charges be brought against me in Virginia. For practical as well as legal purposes, I have no record."

The board received the March 8 letter but did not investigate the problems of which Hughes had given notice. In failing to do so, it disregarded Business and Professions Code sections 480, subdivision (a)(2), and 5552, subdivision (a), which required it to reject Hughes's application. Apparently the March 8 letter was filed and forgotten. The board admitted at trial that it had made a "mistake" in processing his application. Only in May 1991, on receipt of a letter from the National Council of Architectural Registration Boards advising that Hughes may have been denied registration as an architect in other jurisdictions "on the basis of character," did the board begin its inquiry.

The board found that Hughes "did not respond falsely to question 8 on his application. [He] did falsely state in his letter of March 8, 1990, that the charges against him had been dropped. The charges were in fact dismissed in May. However, the evidence indicates that [Hughes] made his statement in error, not as a knowing misstatement."

Nevertheless, the board revoked his license, solely under the authority of Business and Professions Code sections 5583 and 5584, evidently on the basis of misconduct prior to obtaining it. The trial court denied a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5), but the Court of Appeal reversed, explaining that his license was revoked under statutes that did not apply to him.

The relevant statutes provide: "The fact that, in the practice of architecture, the holder of a license has been guilty of fraud or deceit constitutes a ground for disciplinary action." (Bus. & Prof. Code, § 5583.) "The fact that, in the practice of architecture, the holder of a license has been guilty of negligence or willful misconduct constitutes a ground for disciplinary action." (*Id.*, § 5584.) Hence, to be disciplined under these statutes, the licensee must (1) be the holder of a license and (2) have committed the wrongful act "in the practice of architecture."

The "practice of architecture . . . is defined as offering or performing, or being in responsible control of, professional services which require the skills of an architect . . . ." (Bus. & Prof. Code, § 5500.1, subd. (a).) The prior version of this statute was not materially different. (Stats. 1986, ch. 541, § 2, p. 1938.) Hence, nobody can be engaged in the "practice of architecture" without being an "architect."

But "[a]s used in this chapter [Business and Professions Code sections 5500-5610.7], architect means a person who is licensed to practice architecture in this state under the authority of this chapter." (Bus. & Prof. Code, § 5500.) When Hughes committed his wrongful acts, he was not "licensed to practice architecture in this state . . . ." (*Ibid.*) Hence he cannot be disciplined under the statutes in question.

Apparently uncomfortable with the substance of Hughes's point, the board, in the main, argues that he did not raise it below and may not do so now. It then adds, "In any event[,] as the unchallenged factual findings . . . clearly established, Hughes'[s] misconduct was committed in the practice of architecture." I remain unconvinced. With regard to the procedural point, Hughes raised the question whether he may be disciplined under Business and Professions Code section 5583 or 5584, and he has sufficiently preserved his claim. With regard to the board's substantive comment, the factual findings have nothing to do with any statutory limitations.

The majority refer to the need to protect the public. That is indeed the board's duty. (Bus. & Prof. Code, § 5510.1.) The possible consequences of architectural error require no less. But when, as appears from the record, the board fails in its duty, it is the board's procedures that should be adjusted. We should not instead interpret the statutes to rescue the board from its own inattention to Hughes's application.

The statutory construction that the majority prefer is implausible. The Court of Appeal explained that such a "construction would unlink the connection between the holder of a license and the holder's misconduct. Under [that] view, these statutes could be violated by an unlicensed person who commits architectural misconduct anywhere in the world if perchance that person should later become licensed in California. Such a strained construction is contrary to the ordinary meaning of the statutory language."

The Court of Appeal also noted that "whenever a citation for revocation of a license is filed, the citation may 'contain an assessment of a civil penalty.' ([Bus. & Prof. Code,] § 5566.) After exhaustion of the review procedures, the Board may apply to the appropriate superior court for a judgment in the

amount of the civil penalty. ([*Id.*,] § 5566.2, subd. (d).) Under the regulations adopted by the Board, the assessments may range from $50 to $2,000 for each violation depending upon the gravity of the violation and its consequences. (Cal. Code Regs., tit. 16, § 152.) Thus, under the construction advanced by the Board, plaintiff could have been fined under the Act for conduct committed in another jurisdiction when he was a nonresident and years before he was licensed by the Board in California. . . . We would be hard pressed to find a rational basis for the imposition of such a retroactive, extraterritorial fine."

The Court of Appeal also identified another part of the statutory scheme that calls into doubt the majority's interpretation of it. "After an investigation, if the executive officer of the Board has probable cause to believe that a licensee has violated the Act, the officer may issue a citation to the licensee. But before a citation may issue, the executive officer shall submit the alleged violation to a least one designee of the Board who is a certificate holder or a staff architect. 'The review shall include attempts to contact the licensee or unlicensed individual *to discuss and resolve the alleged violation.*' ([Bus. & Prof. Code,] § 5566, italics added.) Obviously, this review procedure could not be applied to a[n] unlicensed nonresident who acted years before in another state. It presupposes that the unlicensed person committed his acts in California or that the violation occurred after the accused was licensed to practice architecture in California."

The majority and I read the statutory scheme differently. Evidently they emphasize *skills*, whereas I emphasize *architect*, in construing Business and Professions Code section 5500.1's definition of the practice of architecture "as offering or performing, or being in responsible control of, professional services which require the *skills* of an *architect* . . . ." (*Id.*, subd. (a), italics added.) The meaning of the statutes in question is not entirely clear. But the majority do not satisfactorily address the incongruities their interpretation creates in the statutory scheme, as identified by the Court of Appeal.

Moreover, the Legislature has distinguished between misconduct by a licensee, i.e., an architect, acting "in the practice of architecture" (Bus. & Prof. Code, §§ 5583, 5584) and misconduct by "an unlicensed individual acting in the capacity of an architect . . ." (*id.*, § 5566).

If Hughes had committed fraud in applying for a California license, he could be sanctioned. (Bus. & Prof. Code, §§ 480, subd. (c), 5552, subd. (a), 5560.) If he had committed malpractice or misconduct after obtaining his California license, he could be sanctioned. (*Id.*, §§ 5583, 5584.) But neither section 5583 nor 5584 of the Business and Professions Code provides a

sanction for the prelicensure misconduct the board found Hughes to have committed—misconduct that his own warning had given the board notice to investigate.

I would affirm the Court of Appeal's judgment.

The petition of appellant Charles Scott Hughes for a rehearing was denied May 20, 1998. Chin, J., did not participate therein. Mosk, J., was of the opinion that the petition should be granted.