[No. A102819. First Dist., Div. Five. Oct. 27, 2004.]

CITY OF BRENTWOOD, Plaintiff and Appellant, v.
CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD,
Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, IV and V.

COUNSEL

Meyers, Nave, Riback, Silver & Wilson, Kenton L. Alm, Andrea J. Saltzman and Julia L. Bond for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Mary Hackenbracht, Assistant Attorney General, Ellen Peter and Linda L. Berg, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**GEMELLO, J.**—The City of Brentwood challenges the imposition of $243,000 in mandatory minimum penalties for violations of the city's wastewater discharge permit. We construe two provisions of the mandatory minimum penalty statute. We hold that the discharger bears the burden of proving that the exceptions in Water Code section 13385, subdivision (j)(1)[1] relieve it of liability for violations that are subject to the mandatory minimum penalties. We also hold that "period of six consecutive months," as that phrase is used in section 13385, subdivision (i), is measured by looking at the 180-day period preceding each violation that potentially is subject to mandatory minimum penalties under that subdivision. We reject the city's substantive due process challenge to the amount of the penalties and its procedural due process challenge to the underlying administrative proceedings. We affirm the judgment denying the city's petition for a writ of mandate.

FACTUAL AND PROCEDURAL BACKGROUND

The City of Brentwood (City) in Contra Costa County operates a wastewater treatment plant that discharges into Marsh Creek, a tributary to the San Joaquin River and Delta. Treated wastewater from the plant is first discharged into on-site percolation ponds where it either evaporates or infiltrates into the area groundwater. A mixture of groundwater and treated wastewater is then discharged into Marsh Creek. Because the plant is surrounded by agricultural land, agricultural runoff may affect the composition of the groundwater and ultimately the effluent that is discharged into the creek.

At the end of 1999 and the beginning of 2000, the City applied for a revised permit for its existing facility and a permit for a new facility. In June 2000, the California Regional Water Quality Control Board, Central Valley Region (Board) issued the City a single permit for both the existing and the

---

[1] All further statutory references are to the Water Code in effect at the time the board imposed penalties on the city (i.e., § 13385 as amended by Stats. 2000, ch. 807, § 2 (hereafter Stats. 2000)), unless otherwise indicated.

new facilities. The permit established effluent limitations for discharges from the plants. As pertinent here, the permit provided that the "dissolved oxygen concentration of the discharge shall not fall below 5.5 mg/1 at all times." The goal of this effluent limitation was to maintain a minimum dissolved oxygen level of 5.0 mg/1 in Marsh Creek. The City was required to monitor the dissolved oxygen level of its discharge on a daily basis and to report its monitoring results to the Board by the first day of the second month following sample collection. The monitoring requirements became effective on July 1, 2000.

In its first monthly report under the new permit, which provided July 2000 monitoring results, the City tables showed that the dissolved oxygen level in the effluent from outlet 2 ranged from 2.0 to 4.6 and averaged 3.0 over the month. In a cover letter, the City wastewater supervisor noted that the levels were lower than normal and said he did not know the cause. "The only changes noticed around the plant site is that the irrigation is now in progress with tail water going out of the new storm/irrigation pipe and construction has started. Operations are normal. To correct this problem an air diffuser manifold has been built and installed in the manhole to increase the D.O. [dissolved oxygen] level. An air blower has also been ordered and will be installed as soon as it comes in. A similar test was done with this system with very good test results for increasing the D.O. level to meet the State discharge requirement. We will continue monitoring and working on this problem until it is corrected."

The dissolved oxygen levels for August 2000 ranged from 1.9 to 4.1 mg/1 and averaged 2.6 mg/1. The City's monthly report, dated September 27, 2000, again acknowledged the low levels, but explained that the air blower had been installed on September 6, 2000, and that levels had improved thereafter. In September 2000, the dissolved oxygen levels ranged from 3.0 to 3.6 mg/1 for the first five days of the month, but jumped to 6.5 mg/1 on September 6 and ranged from 6.5 to 7.6 mg/1 thereafter.

The City maintained the required dissolved oxygen levels throughout October 2000. On two days in November 2000, seven days in December 2000, two days in January 2001, and four days in early February 2001, dissolved oxygen levels dropped below 5.5 mg/1, but not below 5.0 mg/1. The City did not draw attention to these shortfalls in its monthly reports because City officials were under the mistaken impression that the effluent limitation from its old permit, 5.0 mg/1 of dissolved oxygen, was still in effect.

From February 9 to 14, 2001, the dissolved oxygen level fell below 5.0 mg/1. The City explained in its monthly report that the air blower it had

installed in September had malfunctioned on February 9 and that a new blower (which was ordered on an emergency basis) did not arrive until February 14, at which time it was installed. "To eliminate any future problems the air blower will be rebuilt and used as a backup." The City maintained the required dissolved oxygen levels thereafter.

In March 2001, the Board compiled a preliminary "Record of Violations for [Mandatory Minimum Penalty] Enforcement." City representatives met with Board staff in May to request relief from the penalties, but Board staff explained that the penalties were mandatory. On June 1, 2001, the Board issued Administrative Civil Liability Complaint No. 5-01-523, which charged the City with 84 violations of the dissolved oxygen effluent limitation and proposed $243,000 in mandatory penalties calculated as $3,000 per violation times 81 violations, excluding the first three violations pursuant to section 13385, subdivision (i). The City submitted a written response to the complaint.

At the administrative hearing in July, the Board staff and City representatives presented oral testimony. At the conclusion of the hearing, the Board voted to impose the penalties in full. The City petitioned the State Water Resources Control Board (State Board) to review the regional Board's order, but the petition was dismissed. The City then petitioned the Contra Costa County Superior Court for administrative mandamus under Code of Civil Procedure section 1094.5. Venue was changed to the Alameda County Superior Court pursuant to section 13361, subdivision (b). After making evidentiary rulings, the court denied the City's petition without explanation, noting that neither party requested a statement of decision. The City appeals the trial court order.

DISCUSSION

The City raises four challenges to the mandatory minimum penalties. The first two raise questions of statutory interpretation: which party bears the burden of proving whether the exceptions in section 13385, subdivision (j)(1) apply in a particular case, and how the six-month period in section 13385, subdivision (i) should be calculated. The City also raises a substantive due process challenge to the amount of the penalties, and a procedural due process challenge to the conduct of the administrative hearing. We address each of these arguments in turn.

### I. *Burden of Proof*

The City argues that the Board failed to establish that two exceptions to liability under section 13385, subdivision (i) did *not* apply to its case. It

argues that the Board had the burden of proof on this issue. The Board argues that the exceptions are affirmative defenses for which the City bears the burden of proof. The trial court denied the City's petition for writ of mandamus implicitly rejecting the City's allocation of the burden of proof.

### A. *The Statute*

As relevant here, section 13385, subdivision (i) provides for mandatory minimum penalties of three thousand dollars assessed for each violation whenever the person exceeds a waste discharge requirement effluent limitation four or more times in any period of six consecutive months, "except that the requirement to assess the mandatory minimum penalty shall not be applicable to the first three violations." (§ 13385, subd. (i)(1), as amended by Stats. 2000.) Again as relevant here, the exceptions to the mandatory assessment are an "unanticipated, grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight"; and "[a]n intentional act of a third party, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." (§ 13385, subd. (j)(1)(B) and (C), as amended by Stats. 2000[2].)

The issue before us is whether the exceptions to liability in section 13385, subdivision (j)(1) are elements of the offense (the regional Board's burden of proof), or whether they are affirmative defenses (the City's burden of proof.)

### B. *Parties' Contentions*

In its written response to the administrative complaint and during the administrative hearing, the City contended that the natural phenomenon exception of section 13385, subdivision (j)(1)(B) relieved it of liability for the violations.[3] The natural phenomenon cited by the City was an unidentified

---

[2] In their briefing on the burden of proof issue, the parties do not discuss section 13385, subdivision (j)(1)(D) or (2), which created additional exceptions to liability based on a complex set of conditions. (§ 13385, subd. (j)(1)(D), (2) (Stats. 2000).) We have not considered and do not decide whether our burden of proof analysis would apply to the exceptions in subdivision (j)(1)(D) and (2). When we refer to the exceptions of subdivision (j)(1), we are referring to subdivision (j)(1)(A) to (C).

[3] On a slide used by the City's counsel during the hearing, the three exceptions in section 13385, subdivision (j)(1)(A) to (C) were listed, although only subdivision (j)(1)(B) was underlined. The City argues that by projecting this slide during the hearing, the City invited the Board to consider whether the third party exception of subdivision (j)(1)(C) applied to its case. None of the witnesses or Board members discussed the third party exception at the hearing. Because we ultimately conclude that the City bears the burden of proof regarding the exceptions, the City's failure to argue the third party exception to the Board defeats its claim that it is entitled to relief under section 13385, subdivision (j)(1)(C).

change in the composition of the groundwater component of the plant's effluent. The City produced no evidence that the dissolved oxygen levels had dropped in the groundwater component (rather than in the wastewater component) of the effluent, and it produced no evidence of what caused a drop in dissolved oxygen levels in the groundwater. It simply argued that the groundwater was most likely the cause of the violations because the City had found no source of the violations in its own plant. The City noted that the plant had had only one dissolved oxygen violation between 1997 and 1999. It speculated that irrigation, pesticide use and other practices on the agricultural land surrounding the plant could have affected the composition of the groundwater component of the plant's effluent.

Addressing the statutory language, the City argued that the alleged change in the groundwater was "exceptional" because it had never occurred before, "inevitable" because it was unforeseeable, and "irresistible" because it could not be addressed instantaneously. The City further argued that the violation could not have been prevented or avoided by the exercise of due care or foresight. "[N]ever having a problem like this, not knowing what caused it, we are unsure how we could have planned for it or seen it coming."

Board staff took the position that "[t]here was no great disaster or natural phenomenon of exceptional[], inevitable, irresistible character." The assistant executive officer of the Board told Board members, "I have no reason to believe that something naturally occurred to suddenly cause the groundwater to plummet naturally in the area. I know of no mechanism for that occurring, barring major earthquakes or something." Staff speculated that the dissolved oxygen violations may have been caused by construction of the City's new plant but readily acknowledged that they did not know what caused the violations. Staff took the position that the violations were not beyond the City's control. "[I]t took the City about 3 months to correct the problem and subsequent mechanical problems gave rise to additional violations. The record demonstrates that the City could have prevented the DO violations had they better prepared and planned for it."

Board members' comments during deliberations indicate that the Board considered the burden of proof in their decision to impose penalties. Board member Christopher Cabaldon expressly raised the burden of proof issue: ". . . [i]t would be a lot simpler for the State Board to issue some guidance . . . at least what the burden of proof is which is the default if you don't know" the cause of the violation of the effluent limitation. He noted that the cause of the City's violations was unknown. Board chair Robert Schneider took the position that the Board had to assume the City was responsible in the absence of contrary proof. That is, Schneider implicitly took the position that the City bears the burden of showing that one of the

exceptions in section 13385, subdivision (j)(1) applied and had failed to meet that burden. The Board voted to impose the penalties.

In sum, it appears that the Board concluded that the cause of the violations was unknown and imposed the mandatory penalties because the City had failed to affirmatively establish that one of the exceptions to liability in section 13385, subdivision (j)(1) applied.

### C. Statutory Construction

■ Statutory construction is a question of law we decide de novo. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].) Our primary objective in interpreting a statute is to determine and give effect to the underlying legislative intent. (Code Civ. Proc., § 1859.) Intent is determined foremost by the plain meaning of the statutory language. If the language is clear and unambiguous, there is no need for judicial construction. When the language is reasonably susceptible of more than one meaning, it is proper to examine a variety of extrinsic aids in an effort to discern the intended meaning. We may consider, for example, the statutory scheme, the apparent purposes underlying the statute and the presence (or absence) of instructive legislative history. (See *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775–776 [72 Cal.Rptr.2d 624, 952 P.2d 641].)

"If the words of a statute are reasonably free of ambiguity and uncertainty, we look no further than those words to determine the meaning of that language." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1503 [82 Cal.Rptr.2d 368], citing *Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 819 [226 Cal.Rptr. 81, 718 P.2d 68].) Here, the plain language of section 13385, subdivision (j)(1) is silent as to which party bears the burden of proof. It states that the mandatory penalty provisions "do not apply" to the listed circumstances, but does not indicate which party must demonstrate, establish, or show whether those circumstances were present. Nor does it label the exceptions "defenses" or "affirmative defenses." Because the plain language of section 13385 does not indicate which party bears the burden of proof, we must look to extrinsic aids to guide our interpretation.

### 1. Statutory Scheme

■ A court may consider the overall scheme in which an ambiguous statute is included in order to ascertain its intended meaning. (*Hughes v. Board of Architectural Examiners, supra,* 17 Cal.4th at p. 776.) The organization of the division, chapters, and articles is an aid to understanding its purpose. (See *People v. Hull* (1991) 1 Cal.4th 266, 272 [2 Cal.Rptr.2d 526, 820 P.2d 1036].)

Section 13385 is part of state legislation that was enacted to comply with certain provisions of the federal Clean Water Act.[4] The Clean Water Act establishes a National Pollutant Discharge Elimination System (NPDES), which prohibits discharges into the navigable waters of the United States absent a permit. (33 U.S.C. §§ 1311(a), 1312, 1342.) The act authorizes states to issue their own NPDES permits for dischargers within their borders if the states establish programs that satisfy federal standards and that are approved by federal authorities. (33 U.S.C. § 1342(b).) Expressly for that purpose, the California Legislature enacted chapter 5.5 of the "Water Quality" division of the California Water Code,[5] which includes section 13385. (§ 13370; *Sierra Club v. Union Oil Co. of California* (9th Cir. 1987) 813 F.2d 1480, 1483.)[6] Permits issued under chapter 5.5, and enforced in part under section 13385, are an integral part of the Clean Water Act's discharge permit system.

The Clean Water Act is a strict liability statute. (*U.S. v. Allegheny Ludlum Corp.* (3rd Cir. 2004) 366 F.3d 164, 168; *Stoddard v. Western Carolina Regional Sewer Auth.* (4th Cir. 1986) 784 F.2d 1200, 1208; *United States v. Earth Sciences, Inc.* (10th Cir. 1979) 599 F.2d 368, 374.) "The first principle of the statute is . . . that it is unlawful to pollute at all. The Clean Water Act does not permit pollution whenever that activity might be deemed reasonable or necessary; rather, the statute provides that pollution is permitted only when discharged under the conditions or limitations of a [NPDES] permit." (*Natural Resources Defense Council, Inc. v. U.S. E.P.A.* (D.C. Cir. 1987) 822 F.2d 104, 123; see 33 U.S.C. § 1311(a).)

Enforcement of NPDES effluent limitations is based on self-monitoring and reporting; permit holders must submit regular discharge monitoring reports, which serve as admissions when discharges violate the effluent limitations established in the discharger's permit. (*U.S. v. CPS Chemical Co., Inc.* (E.D.Ark. 1991) 779 F.Supp. 437, 442.) The purpose of this system is "to keep enforcement actions simple and speedy: [¶] '[o]ne purpose of the [monitoring] requirements is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements of this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or

---

[4] The Clean Water Act is the popular title of the federal Water Pollution Prevention and Control Act, 33 United States Code sections 1251–1387. (See *Gwaltney v. Chesapeake Bay Foundation* (1987) 484 U.S. 49, 52 [98 L.Ed.2d 306, 108 S.Ct. 376].)

[5] California Water Code, division 7, chapter 5.5, sections 13370–13389.

[6] See generally 2 Manaster and Selmi, California Environmental Law and Land Use Practice (2004) Water Quality Control, for history of the California legislation (§ 31.08, pp. 31-13 to 31-14; § 31.24[2], pp. 31-37 to 31-38) and division of state and federal authority in issuing water discharge permits in California (§ 31.07 at pp. 31-11 to 31-13; § 31.24[2] at pp. 31-37 to 31-38).

delay.' " (*Ibid.*, quoting Sen. Rep. No. 414, 92d Cong., 1st Sess. p. 64 (1971), reprinted in 1972 U.S. Code Cong. & Admin. News, pp. 3668, 3730.)

Exceptions to liability for violations of NPDES effluent limitations under the Clean Water Act are affirmative defenses. (*U.S. v. CPS Chemical Co., Inc., supra,* 779 F.Supp. at p. 454.) Similarly, exceptions to liability under the Clean Water Act for the costs of cleaning up oil spills are affirmative defenses. (33 U.S.C. § 1321(f)(1)–(3), (g).)

Section 13385 is a part of the NPDES system. The purpose and structure of the NPDES system strongly support the argument that the exceptions in section 13385, subdivision (j)(1) should be construed as affirmative defenses. Requiring water quality control boards to affirmatively disprove each of the exceptions in that subdivision would undermine the legislative goal of simple and swift enforcement with a minimum of fact-finding and investigation. Construing the exceptions as affirmative defenses is consistent with the fundamental structure of the permit system, which places the burden of monitoring and reporting violations on the dischargers themselves.

### 2. *Legislative Purpose and History*

■ An examination of the legislative purpose and history of the mandatory minimum penalty provisions reinforces our view that the exceptions in section 13385, subdivision (j)(1) should be construed as affirmative defenses. When construing an ambiguous statute, a court may consider its apparent purpose. (*Hughes v. Board of Architectural Examiners, supra,* 17 Cal.4th at p. 776.)

Mandatory minimum penalties were enacted in 1999 in two bills, Senate Bill No. 709 and Assembly Bill No. 1140. Both bills were signed into law. Each bill incorporated the following legislative finding: "Recent investigations indicate that current enforcement efforts of the state board and the regional boards may not be achieving full compliance with waste discharge requirements in a timely manner, and that swift and timely enforcement of waste discharge requirements will assist in bringing the state's waters into compliance and will ensure that violators do not realize economic benefits from noncompliance." (Stats. 1999, ch. 92, § 2(d) [Assem. Bill No. 1104]; Stats. 1999, ch. 93, § 2(d) [Sen. Bill No. 709].) In other words, the goal of the legislation was to ensure prompt, streamlined enforcement to create a powerful incentive for dischargers to comply with permit requirements.

This clear statement of legislative purpose is amplified by reference to the statute's legislative history. While the legislation was under consideration, the Legislative Analyst's Office published an analysis and recommended passage. (Legis. Analyst, analysis of 1999–2000 Budget Bill, Sen. Bill No. 160, pp. B-114 to B-115.) The analysis cited statistics showing administrative penalties had been levied for only 1 percent of the known violations of the act. (*Id.*, pp. B-113, B-115.) Mandatory penalties, the Legislative Analyst's Office wrote, would increase enforcement and make it more consistent, which would likely result in a substantial increase in compliance. (*Id.*, p. B-115.) The Legislative Analyst's Office noted that Assembly Bill No. 50 (the predecessor to Assembly Bill No. 1140) was modeled on a mandatory minimum penalty law enacted in New Jersey in 1990, and it endorsed that model. (Legis. Analyst, *supra*, p. B-115.)

This legislative history strongly indicates that the exceptions in section 13385, subdivision (j)(1) are affirmative defenses. The mandatory penalties represent a further move away from discretion and detailed fact-finding and toward swifter and more predictable enforcement. Addressing concerns about the potential costs of increased enforcement, the Legislative Analyst's Office observed that the New Jersey experience had shown the policy to be cost effective, in part because "staff preparation for a penalty hearing under mandatory penalties is not as labor intensive as for hearings in cases where penalties are discretionary . . . [because] less time is spent assessing mitigating factors to determine whether a penalty *should* be assessed." (Legis. Analyst, *supra*, p. B-115.) Were we to construe the exceptions to be elements of the violation that must be proven by the Board staff, we would undermine the Legislature's intent to enact a streamlined, cost effective and swift enforcement policy.

In sum, placing the burden of proof on the discharger rather than the Board is more consistent with the statutory scheme of the Clean Water Act and with the legislative purpose and history of the mandatory minimum penalty provisions.

### 3. *Descriptive Nature Test*

Whether an exception to liability is an element of an offense or an affirmative defense depends on "whether the exception is so incorporated with, and becomes a part of the enactment, as to constitute a part of the definition, or description of the offense." (*Ex parte S.C. Hornef* (1908) 154 Cal. 355, 360 [97 P. 891].)[7] " '[W]here [the exceptions] afford matter of

---

[7] The Court of Appeal denominated the test established in *Hornef* as the "descriptive nature test" in *People v. Gott* (1994) 26 Cal.App.4th 881, 886 [31 Cal.Rptr.2d 840]. Although the

excuse merely,' " they are affirmative defenses. (*People v. Lawrence* (1961) 198 Cal.App.2d 54, 61 [18 Cal.Rptr. 196], quoting *People v. H. Jevne Co.* (1919) 179 Cal. 621, 625 [178 P. 517].) Although the genesis of these principles is criminal cases, the principles also have been applied to whether an exception to civil liability was an affirmative defense. (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1665–1669 [3 Cal.Rptr.3d 279].)

Applying the descriptive nature test to a statutory construction of the exceptions in section 13385, subdivision (j)(1) supports the Board's position that the exceptions are affirmative defenses for which the City bears the burden of proof.

The offense is defined as exceeding a waste discharge requirement effluent limitation. (§ 13385, subd. (i)(1), as amended by Stats. 2000.) The harmful conduct that the statute proscribes is the discharge of harmful substances into the state water supply. The exceptions set forth in section 13385, subdivision (j)(1) are excuses. They do not make the defendant's conduct any less harmful (the harmful substances are still discharged into the water supply), but they do provide a legal excuse to liability. The exceptions are carefully limited to circumstances outside a reasonably cautious defendant's control. The natural phenomenon must be an "unanticipated, grave natural disaster" or an "exceptional, inevitable, and irresistible" event, "the effects of which could not have been prevented or avoided by the exercise of due care or foresight." (§ 13385, subd. (j)(1)(B), as amended by Stats. 2000.) An act of a third party will relieve the defendant of liability only if it was intentional *and* only if the defendant could not have prevented or avoided its effects with the exercise of due care or foresight. (§ 13385, subd. (j)(1)(C), as amended by Stats. 2000.) These are limited exceptions to proscribed conduct, rather than exceptions that define the offense. The descriptive nature test supports placing the burden of proof on the discharger.

■ Based on our construction of the statute, we hold that the discharger, rather than the Board, bears the burden of proving that one of the exceptions in section 13385, subdivision (j)(1), relieves the discharger of liability for mandatory minimum penalties under section 13385, subdivision (i). The exceptions in section 13385, subdivision (j)(1) are affirmative defenses to liability. Because the Board correctly allocated the burden of proof in the

term is not regularly employed in the pertinent cases, no alternative term has been adopted, so we use *Gott*'s term.

City's case, we reject the City's challenge to the civil liability order on the ground that the burden of proof was improperly shifted to the City.

II. *Other Arguments**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. *Six-month Period*

Mandatory minimum penalties were imposed on the City pursuant to section 13385, subdivision (i), which provides: "[A] mandatory minimum penalty of three thousand dollars ($3,000) shall be assessed for each violation whenever the person does any of the following *four or more times in any period of six consecutive months*, except that the requirement to assess *the mandatory minimum penalty shall not be applicable to the first three violations*: (A) Exceeds a waste discharge requirement effluent limitation." (§ 13385, subd. (i)(1), as amended by Stats. 2000, italics added.) The statute defined "period of six consecutive months" as "the period beginning on the day following the date on which . . . one of the violations described in subdivision (i) occurs and ending 180 days after that date." (§ 13385, subd. (h)(2)(C), as amended by Stats. 2000.)

The State Board has interpreted "any period of six consecutive months" as a "rolling" six-month period. Consistent with this interpretation, the regional Board applied the provision by looking at the six-month period preceding each violation. If the violation was at least the fourth violation in the preceding six-month period, the penalty was imposed. The City argues that the six-month period should be measured from the date of a first violation. After that six-month period expires, a new six-month period would commence with the next violation. The first three violations in the second six-month period would be exempt from the mandatory penalties, even if they occurred less than six months after the most recent three prior violations. Had the Board followed the City's approach, the first six-month period would have expired on January 2, 2001; that is, 180 days after July 6, 2000, the day following the date of the first violation. A new six-month period would have commenced on January 3, 2001, the date of the first violation following the expiration of the first six-month period. The first three violations in the second six-month period would be exempt from the mandatory minimum penalty requirement, resulting in a $9,000 savings to the City.

*See footnote, *ante*, page 714.

## A. *Judicial Notice*

As a preliminary matter, we take judicial notice of a letter sent by legislators to the executive officer of the State Board to protest the State Board's original interpretation of six-month period in the mandatory minimum penalty provisions. (Evid. Code §§ 452, subd. (h), 459, subd. (a).)

■ We reject the City's argument that the letter is not an appropriate subject of judicial notice regarding the legislative history of the statute. Letters expressing the opinions of individual legislators often are irrelevant to an issue of statutory construction, which depends on the intent of the entire Legislature, not of individual legislators. (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062 & fn. 5 [48 Cal.Rptr.2d 1, 906 P.2d 1057].) This particular letter is relevant to our review of the legislative history because it apparently prompted a change in the State Board's interpretation of the statute, and the Legislature amended the statute to define six-month period against the background of that administrative interpretation. It is relevant merely because it illustrates the context in which the Legislature enacted the definition of "period of six consecutive months." (Cf. *McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161, fn. 3 [69 Cal.Rptr.2d 692].)

## B. *Plain Language*

As noted, when interpreting a statute our duty is to give effect to the intent of the Legislature. We first look to the words of the statute, giving them their ordinary meaning.

The language of section 13385 is ambiguous. The phrase "any period of six consecutive months" supports the Board's interpretation because "any" suggests an interpretation that imposes penalties *whenever* a violation can be shown to have occurred within six months of three prior violations. At the same time, the definition of "period of six consecutive months" can be construed to support the City's interpretation. By requiring the six-month period to be measured prospectively from a violation ("the period *beginning* on the day following the date on which . . . one of the violations described in subdivision (i) occurs and ending 180 days *after* that date") (§ 13385, subd. (h)(2)(C), as amended by Stats. 2000, italics added), rather than defining "period of six months" simply as 180 consecutive days, the definition suggests that the six-month period in section 13385, subdivision (i) is fixed rather than shifting or "rolling," as the State Board currently describes it.

Again, because the statutory language is open to conflicting interpretations, we look to the legislative history and purpose of the statute to inform our interpretation.

## C. *Legislative History*

When the mandatory minimum penalty provision was enacted in July 1999, the statute did not include a definition of six-month period. (§ 13385, as amended by Stats. 1999, ch. 993, § 6.) On December 6, 1999, the chief counsel for the State Board prepared a memorandum for the executive officer of the State Board providing his interpretation of the new statute.[8] The memorandum provided the following guidance on calculating the six-month period mentioned in section 13385, subdivisions (h) and (i): "To calculate violations under the act, the six-month period starts with the first violation in any category subject to CWC [California Water Code] section 13385(h) or (i) and runs for six months following the first violation in any category subject to CWC section 13385(h) or (i). For example, if a discharger violates an effluent limitation that constitutes a serious violation in February 2000, the six-month period for calculating penalties for serious violations begins. At the end of the six months, the Regional Board must determine how many serious violations occurred. . . . Once each six-month period ends, a new six-month period will begin for the discharger when a violation described in subsection 13385(h) or (i) occurs."[9] This interpretation is consistent with the City's proffered interpretation of the statute.

However, in a January 18, 2000, letter to the executive officer of the State Board, five legislators, including Assemblywoman Carole Migden, the author of the mandatory minimum penalty legislation, and Senator Byron Sher, the author of the 2000 amendment to the statute, objected to the chief counsel's interpretation of the six-month period. "The proposed interpretation of the term 'any six month period' undermines one of the basic purposes of the law—discouraging repeat violations. [¶] . . . [¶] The Counsel's interpretation of the law undermines the deterrent effect by proposing that a discharger is cleared six months after their first violation regardless of whether or not they have come into compliance. For example, under the proposed interpretation, a discharger who violated a monthly average permit every month between January and September would only be subject to mandatory penalties for the months of April, May and June, then its slate would be cleared arbitrarily.

---

[8] Chief Counsel, State Water Resources Control Board, *The Clean Water Enforcement and Pollution Prevention Act of 1999 Summary and Questions and Answers,* page 9, December 6, 1999.

[9] State Board, page 9, December 6, 1999.

The discharger clearly does not have as great an incentive to avoid triggering the threshold and no incentive to come into compliance with the law for at least six months. If the Legislature had intended such an artificial cut-off period, it would have specified 'six months from the first violation' rather than '*any* six month period.' "[10]

In February 2000, Senator Sher introduced a bill to amend section 13385, subdivisions (h) and (i), the mandatory minimum penalty provisions. (Sen. Bill No. 2165 (1999–2000 Reg. Sess.) § 1.) He and other legislators prepared the amendment in response to Governor Davis's request, when he signed the 1999 legislation, that the Legislature consider amendments that would provide some flexibility in applying the mandatory penalties.[11] Senate Bill No. 2165, as originally proposed, did not address the six-month period language.

On March 22, 2000, the State Board's chief counsel wrote an addendum to his December 1999 memorandum. He explained that he was responding to "several more questions concerning SB 709 that were either not addressed in the December 6, 1999, Memorandum or are in need of revision." He revised his interpretation of " 'any six-month period' ": "Under CWC section 13385(i)(2)[12], . . . [t]he six-month period should be calculated as a 'rolling' six months. For example, if the discharger violates an effluent limitation in January, April, May, July, August (2 violations), and October, . . . [t]he Regional Water Board must look at each new violation and review violations for the preceding six-month period. In April there were only two violations for the preceding six months; in May there were only three violations for the preceding six months; in July there were only three violations for the preceding six months; in August there were five violations for the preceding six months. The discharger would then be subject to a mandatory penalty of $6,000 because it had four or more violations in the preceding six-month

[10] The legislators' letter refers to the phrase "any six month period." This is the language used in the original legislation that enacted the mandatory minimum penalty provisions. (§ 13385, subd. (i)(2)(A), as enacted by Stats. 1999, ch. 93, § 6.) (The Assembly Bill used slightly different language, "any 180-day period" (§ 13385, subd. (i)(2), enacted by Stats. 1999, ch. 92, § 7), but the language of the Senate Bill, which was enacted second and was assigned a higher chapter number, prevailed over the language of the Assembly Bill. (Gov. Code, § 9605.)

[11] Governor Gray Davis, letter to the Senate (July 12, 1999).

[12] At the time this memorandum was written, section 13385, subdivision (i)(2)(A) to (D) provided for mandatory minimum penalties when certain violations occurred four or more times in a six-month period. (Stats. 1999, ch. 93, § 6.) At the time penalties were imposed on the City, these provisions were codified in section 13385, subdivision (i)(1) to (4). (Stats. 2000, ch. 807, § 2.)

period (April, May, July, and August), but the first three are not assessed a penalty."[13]

On May 8, 2000, Senate Bill No. 2165 was modified to include a definition of "period of six consecutive months." (Sen. Amend. to Sen. Bill No. 2165 (1999–2000 Reg. Sess.) § 2, May 8, 2000.) That definition was included in the final version of the bill, enacted in September 2000. (§ 13385, subd. (h)(2)(C), as amended by Stats. 2000, eff. Jan. 1, 2001.)

In April 2001, the State Board published guidelines for the interpretation of the amended mandatory minimum penalty statute, "SB 709 and SB 2165 Questions and Answers."[14] Regarding the six-month period, the State Board explained: "SB 2165, which became effective on January 1, 2001, . . . added a clarifying definition of a 'period of six consecutive months' in order to facilitate the necessary calculations (because the months have differing numbers of days). The period is now defined as the 180 days immediately following the first violation. Because this merely ratifies the period that the State and Regional Boards have been using, this definition is not considered to be a substantive change in the law."[15]

An attachment to the April 2001 guidelines provides graphs illustrating how the six-month period should be calculated in five different situations.[16] This attachment illustrates that the State Board still adhered to the "rolling" interpretation of six-month period, as described in the March 2000 memorandum. In February 2002, the State Board published a Water Quality Enforcement Policy, which was adopted as official policy by way of regulation in July 2002. (See Cal. Code Regs., tit. 23, § 2910.) This policy statement reaffirms that the six-month period in section 13385, subdivision (i), "is calculated as a 'rolling' 180 days."[17] Section 13385 was amended again in 2001 and 2002, but the definition of "period of six consecutive months" was never modified to alter the "rolling" interpretation of six-month period. (Stats. 2001, ch. 869, § 7; Stats. 2002, ch. 1019, §§ 2, 3.)[18]

---

[13] Chief Counsel William R. Atwater, addendum to memorandum of December 6, 1999, to Walt Pettit, March 22, 2000.

[14] State Water Resources Control Board, April 17, 2001.

[15] State Water Resources Control Board, April 17, 2001, question 33, page 12.

[16] State Water Resources Control Board, April 17, 2001, pages 29–31.

[17] State Water Resources Control Board, April 17, 2001, page 29.

[18] In 2002, the definition of "period of six consecutive months" was moved from section 13385, subdivision (h)(2)(C) to subdivision (i)(2); the word "beginning" was changed to "commencing," the reference to serious violations was omitted, and the phrase "the day following" was omitted, thus shortening the calculation of the six-month period by one day. (Stats. 2002, ch. 1019, § 3.)

■ Based on this legislative history, we conclude that the State Board's "rolling" interpretation of the six-month period is consistent with legislative intent. Senate Bill No. 2165 was enacted on the background of the State Board chief counsel's interpretation of the 1999 statute. Specifically, the "period of six consecutive months" definition was added following the chief counsel's March 2000 adoption of a "rolling" interpretation of the six-month period in section 13385, subdivision (i). The State Board's April 2001 guideline explains that the definition of "six-month period" in the statute was enacted to address the ambiguity of "six months" in light of the differing lengths of the calendar months.

Had the Legislature intended to challenge the chief counsel's interpretation of the period as "rolling," we would expect them to have done so explicitly. The State Board continued to adhere to the "rolling" interpretation in its April 2001 and February 2002 interpretations and the Legislature amended section 13385 again in 2001 and 2002 without changing the definition of the six-month period in relevant part. The Legislature's silence in the face of the State Board's consistent and explicit interpretation signals the Legislature's acceptance of that interpretation.

### D. Legislative Purpose

The "rolling" interpretation of the six-month period also best effectuates the deterrent purpose of the mandatory minimum penalties by providing the discharger with a clear disincentive to reach the three-violation threshold and a clear incentive to get into compliance for at least six months after being fined. The City's interpretation, on the other hand, lets a repeat violator escape liability at the expiration of an arbitrary six-month period, even if the violations have continued unabated. This escape period bears no relation to the purpose of the law, which is to guarantee more consistent enforcement and thereby deter repeat violations of water quality standards.

The legislative history and purpose of the statute strongly support the Board's interpretation of "period of six consecutive months" in section 13385, subdivision (i) as "rolling." The City's argument that mandatory penalties should not have been imposed for three of the violations in 2001 fails.

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Jones, P. J., and Simons, J., concurred.

---

*See footnote, *ante*, page 714.